# GADE, DIRECTOR, ILLINOIS ENVIRONMENTAL PROTECTION AGENCY *v.* NATIONAL SOLID WASTES MANAGEMENT ASSOCIATION

No. 90–1676.   Argued March 23, 1992—Decided June 18, 1992

O'CONNOR, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, III, and IV, in which REHN-QUIST, C. J., and WHITE, SCALIA, and KENNEDY, JJ., joined, and an opinion with respect to Part II, in which REHNQUIST, C. J., and WHITE and SCALIA, JJ., joined. KENNEDY, J., filed an opinion concurring in part and concurring in the judgment, *post*, p. 109. SOUTER, J., filed a dissenting opinion, in which BLACKMUN, STEVENS, and THOMAS, JJ., joined, *post*, p. 114.

*John A. Simon*, Assistant Attorney General of Illinois, argued the cause for petitioner. With him on the briefs were *Roland W. Burris*, Attorney General, *Rosalyn B. Kaplan*, Solicitor General, and *Tanya Solov*, Assistant Attorney General.

*Donald T. Bliss* argued the cause for respondent. With him on the brief were *Arthur B. Culvahouse, Jr., Bruce J. Parker*, and *John T. Van Gessel*.

*William K. Kelley* argued the cause *pro hac vice* for the United States as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General Starr, Deputy Solic-*

*itor General Mahoney, Allen H. Feldman, Steven J. Mandel,* and *Nathaniel I. Spiller.*\*

JUSTICE O'CONNOR announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, III, and IV, and an opinion with respect to Part II in which THE CHIEF JUSTICE, JUSTICE WHITE, and JUSTICE SCALIA join.

In 1988, the Illinois General Assembly enacted the Hazardous Waste Crane and Hoisting Equipment Operators Licensing Act, Ill. Rev. Stat., ch. 111, ¶¶ 7701–7717 (1989), and the Hazardous Waste Laborers Licensing Act, Ill. Rev. Stat., ch. 111, ¶¶ 7801–7815 (1989) (together, licensing acts). The stated purpose of the licensing acts is both "to promote job safety" and "to protect life, limb and property." ¶¶ 7702, 7802. In this case, we consider whether these "dual impact" statutes, which protect both workers and the general public, are pre-empted by the federal Occupational Safety and Health Act of 1970, 84 Stat. 1590, 29 U.S.C. § 651 *et seq.* (OSH Act), and the standards promulgated thereunder by the Occupational Safety and Health Administration (OSHA).

---

*Briefs of *amici curiae* urging reversal were filed for the State of New York et al. by *Robert Abrams,* Attorney General of New York, *Jerry Boone,* Solicitor General, and *Jane Lauer Barker* and *Richard Corenthal,* Assistant Attorneys General, and by the Attorneys General for their respective States as follows: *Richard Blumenthal* of Connecticut, *Charles M. Oberly III* of Delaware, *Michael E. Carpenter* of Maine, *J. Joseph Curran, Jr.,* of Maryland, *Scott Harshbarger* of Massachusetts, *Frank J. Kelley* of Michigan, *Robert J. Del Tufo* of New Jersey, and *Lee Fisher* of Ohio; and for the American Federation of Labor and Congress of Industrial Organizations by *Marsha S. Berzon* and *Laurence Gold.*

Briefs of *amici curiae* urging affirmance were filed for the Chamber of Commerce of the United States by *Glen D. Nager, Robert C. Gombar, Stephen A. Bokat, Robin S. Conrad,* and *Mona C. Zeiberg;* for the Flavor & Extract Manufacturers' Association et al. by *Daniel R. Thompson* and *John P. McKenna;* and for the Washington Legal Foundation by *Daniel J. Popeo* and *Richard A. Samp.*

I

The OSH Act authorizes the Secretary of Labor to promulgate federal occupational safety and health standards. 29 U. S. C. § 655. In the Superfund Amendments and Reauthorization Act of 1986 (SARA), Congress directed the Secretary of Labor to "promulgate standards for the health and safety protection of employees engaged in hazardous waste operations" pursuant to her authority under the OSH Act. SARA, Pub. L. 99–499, Title I, § 126, 100 Stat. 1690–1692, codified at note following 29 U. S. C. § 655. In relevant part, SARA requires the Secretary to establish standards for the initial and routine training of workers who handle hazardous wastes.

In response to this congressional directive, OSHA, to which the Secretary has delegated certain of her statutory responsibilities, see *Martin* v. *Occupational Safety and Health Review Comm'n*, 499 U. S. 144, 147, n. 1 (1991), promulgated regulations on "Hazardous Waste Operations and Emergency Response," including detailed regulations on worker training requirements. 51 Fed. Reg. 45654, 45665–45666 (1986) (interim regulations); 54 Fed. Reg. 9294, 9320–9321 (1989) (final regulations), codified at 29 CFR § 1910.120 (1991). The OSHA regulations require, among other things, that workers engaged in an activity that may expose them to hazardous wastes receive a minimum of 40 hours of instruction off the site, and a minimum of three days actual field experience under the supervision of a trained supervisor. § 1910.120(e)(3)(i). Workers who are on the site only occasionally or who are working in areas that have been determined to be under the permissible exposure limits must complete at least 24 hours of off-site instruction and one day of actual field experience. §§ 1910.120(e)(3)(ii) and (iii). On-site managers and supervisors directly responsible for hazardous waste operations must receive the same initial training as general employees, plus at least eight additional hours of specialized training on various health and safety

programs. § 1910.120(e)(4). Employees and supervisors are required to receive eight hours of refresher training annually. § 1910.120(e)(8). Those who have satisfied the training and field experience requirement receive a written certification; uncertified workers are prohibited from engaging in hazardous waste operations. § 1910.120(e)(6).

In 1988, while OSHA's interim hazardous waste regulations were in effect, the State of Illinois enacted the licensing acts at issue here. The laws are designated as acts "in relation to environmental protection," and their stated aim is to protect both employees and the general public by licensing hazardous waste equipment operators and laborers working at certain facilities. Both licensing acts require a license applicant to provide a certified record of at least 40 hours of training under an approved program conducted within Illinois, to pass a written examination, and to complete an annual refresher course of at least eight hours of instruction. Ill. Rev. Stat., ch. 111, ¶¶ 7705(c) and (e), 7706(c) and (d), 7707(b), 7805(c) and (e), 7806(b). In addition, applicants for a hazardous waste crane operator's license must submit "a certified record showing operation of equipment used in hazardous waste handling for a minimum of 4,000 hours." ¶ 7705(d). Employees who work without the proper license, and employers who knowingly permit an unlicensed employee to work, are subject to escalating fines for each offense. ¶¶ 7715, 7716, 7814.

The respondent in this case, National Solid Wastes Management Association (Association), is a national trade association of businesses that remove, transport, dispose, and handle waste material, including hazardous waste. The Association's members are subject to the OSH Act and OSHA regulations, and are therefore required to train, qualify, and certify their hazardous waste remediation workers. 29 CFR § 1910.120 (1991). For hazardous waste operations conducted in Illinois, certain of the workers employed by the Association's members are also required to obtain licenses

pursuant to the Illinois licensing acts. Thus, for example, some of the Association's members must ensure that their employees receive not only the 3 days of field experience required for certification under the OSHA regulations, but also the 500 days of experience (4,000 hours) required for licensing under the state statutes.

Shortly before the state licensing acts were due to go into effect, the Association brought a declaratory judgment action in United States District Court against Bernard Killian, the former Director of the Illinois Environmental Protection Agency (IEPA); petitioner Mary Gade is Killian's successor in office and has been substituted as a party pursuant to this Court's Rule 35.3. The Association sought to enjoin IEPA from enforcing the Illinois licensing acts, claiming that the acts were pre-empted by the OSH Act and OSHA regulations and that they violated the Commerce Clause of the United States Constitution. The District Court held that state laws that attempt to regulate workplace safety and health are not pre-empted by the OSH Act when the laws have a "legitimate and substantial purpose apart from promoting job safety." App. to Pet. for Cert. 54. Applying this standard, the District Court held that the Illinois licensing acts were not pre-empted because each protected public safety in addition to promoting job safety. Id., at 56–57. The court indicated that it would uphold a state regulation implementing the 4,000-hour experience requirement, as long as it did not conflict with federal regulations, because it was reasonable to conclude that workers who satisfy the requirement "will be better skilled than those who do not; and better skilled means fewer accidents, which equals less risk to public safety and the environment." Id., at 59. At the same time, the District Court invalidated the requirement that applicants for a hazardous waste license be trained "within Illinois" on the ground that the provision did not contribute to Illinois' stated purpose of protecting public safety. Id., at 57–58. The court declined to consider the

Association's Commerce Clause challenge for lack of ripeness. *Id.*, at 61–62.

On appeal, the United States Court of Appeals for the Seventh Circuit affirmed in part and reversed in part. *National Solid Wastes Management Assn.* v. *Killian*, 918 F. 2d 671 (1990). The Court of Appeals held that the OSH Act pre-empts all state law that "constitutes, in a direct, clear and substantial way, regulation of worker health and safety," unless the Secretary has explicitly approved the state law. *Id.*, at 679. Because many of the regulations mandated by the Illinois licensing acts had not yet reached their final form, the Court of Appeals remanded the case to the District Court without considering which, if any, of the Illinois provisions would be pre-empted. *Id.*, at 684. The court made clear, however, its view that Illinois "cannot regulate worker health and safety under the guise of environmental regulation," and it rejected the District Court's conclusion that the State's 4,000-hour experience requirement could survive pre-emption simply because the rule might also enhance public health and safety. *Ibid.* Writing separately, Judge Easterbrook expressed doubt that the OSH Act pre-empts nonconflicting state laws. *Id.*, at 685–688. He concluded, however, that if the OSH Act does pre-empt state law, the majority had employed an appropriate test for determining whether the Illinois licensing acts were superseded. *Id.*, at 688.

We granted certiorari, 502 U. S. 1012 (1991), to resolve a conflict between the decision below and decisions in which other Courts of Appeals have found the OSH Act to have a much narrower pre-emptive effect on "dual impact" state regulations. See *Associated Industries of Massachusetts* v. *Snow*, 898 F. 2d 274, 279 (CA1 1990); *Environmental Encapsulating Corp.* v. *New York City*, 855 F. 2d 48, 57 (CA2 1988); *Manufacturers Assn. of Tri-County* v. *Knepper*, 801 F. 2d 130, 138 (CA3 1986), cert. denied, 484 U. S. 815 (1987); *New*

*Jersey State Chamber of Commerce* v. *Hughey,* 774 F. 2d 587, 593 (CA3 1985).

## II

Before addressing the scope of the OSH Act's pre-emption of dual impact state regulations, we consider petitioner's threshold argument, drawn from Judge Easterbrook's separate opinion below, that the Act does not pre-empt nonconflicting state regulations at all. "[T]he question whether a certain state action is pre-empted by federal law is one of congressional intent. '"The purpose of Congress is the ultimate touchstone."'" *Allis-Chalmers Corp.* v. *Lueck,* 471 U. S. 202, 208 (1985) (quoting *Malone* v. *White Motor Corp.,* 435 U. S. 497, 504 (1978)). "To discern Congress' intent we examine the explicit statutory language and the structure and purpose of the statute." *Ingersoll-Rand Co.* v. *McClendon,* 498 U. S. 133, 138 (1990); see also *FMC Corp.* v. *Holliday,* 498 U. S. 52, 56–57 (1990).

In the OSH Act, Congress endeavored "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions." 29 U. S. C. § 651(b). To that end, Congress authorized the Secretary of Labor to set mandatory occupational safety and health standards applicable to all businesses affecting interstate commerce, 29 U. S. C. § 651(b)(3), and thereby brought the Federal Government into a field that traditionally had been occupied by the States. Federal regulation of the workplace was not intended to be all encompassing, however. First, Congress expressly saved two areas from federal pre-emption. Section 4(b)(4) of the OSH Act states that the Act does not "supersede or in any manner affect any workmen's compensation law or . . . enlarge or diminish or affect in any other manner the common law or statutory rights, duties, or liabilities of employers and employees under any law with respect to injuries, diseases, or death of employees arising out of, or in the course of, employment." 29 U. S. C. § 653(b)(4). Section 18(a) provides that the Act does not "prevent any State

agency or court from asserting jurisdiction under State law over any occupational safety or health issue with respect to which no [federal] standard is in effect." 29 U. S. C. § 667(a).

Congress not only reserved certain areas to state regulation, but it also, in § 18(b) of the Act, gave the States the option of pre-empting federal regulation entirely. That section provides:

"Submission of State plan for development and enforcement of State standards to preempt applicable Federal standards.

"Any State which, at any time, desires to assume responsibility for development and enforcement therein of occupational safety and health standards relating to any occupational safety or health issue with respect to which a Federal standard has been promulgated [by the Secretary under the OSH Act] shall submit a State plan for the development of such standards and their enforcement." 29 U. S. C. § 667(b).

About half the States have received the Secretary's approval for their own state plans as described in this provision. 29 CFR pts. 1952, 1956 (1991). Illinois is not among them.

In the decision below, the Court of Appeals held that § 18(b) "unquestionably" pre-empts any state law or regulation that establishes an occupational health and safety standard on an issue for which OSHA has already promulgated a standard, unless the State has obtained the Secretary's approval for its own plan. 918 F. 2d, at 677. Every other federal and state court confronted with an OSH Act pre-emption challenge has reached the same conclusion,[1] and so do we.

---

[1] *E. g., Associated Industries of Massachusetts* v. *Snow,* 898 F. 2d 274, 278 (CA1 1990); *Environmental Encapsulating Corp.* v. *New York City,* 855 F. 2d 48, 55 (CA2 1988); *United Steelworkers of America* v. *Auchter,* 763 F. 2d 728, 736 (CA3 1985); *Farmworker Justice Fund, Inc.* v. *Brock,* 258 U. S. App. D. C. 271, 283–284, 811 F. 2d 613, 625–626, vacated on other grounds, 260 U. S. App. D. C. 167, 817 F. 2d 890 (1987) (en banc); *Ohio*

Pre-emption may be either expressed or implied, and "is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Jones* v. *Rath Packing Co.*, 430 U. S. 519, 525 (1977); *Shaw* v. *Delta Air Lines, Inc.*, 463 U. S. 85, 95 (1983); *Fidelity Fed. Sav. & Loan Assn.* v. *De la Cuesta*, 458 U. S. 141, 152–153 (1982). Absent explicit pre-emptive language, we have recognized at least two types of implied pre-emption: field pre-emption, where the scheme of federal regulation is " 'so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it,' " *id.*, at 153 (quoting *Rice* v. *Santa Fe Elevator Corp.*, 331 U. S. 218, 230 (1947)), and conflict pre-emption, where "compliance with both federal and state regulations is a physical impossibility," *Florida Lime & Avocado Growers, Inc.* v. *Paul*, 373 U. S. 132, 142–143 (1963), or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines* v. *Davidowitz*, 312 U. S. 52, 67 (1941); *Felder* v. *Casey*, 487 U. S. 131, 138 (1988); *Perez* v. *Campbell*, 402 U. S. 637, 649 (1971).

Our ultimate task in any pre-emption case is to determine whether state regulation is consistent with the structure and purpose of the statute as a whole. Looking to "the provisions of the whole law, and to its object and policy," *Pilot Life Ins. Co.* v. *Dedeaux*, 481 U. S. 41, 51 (1987) (internal quotation marks and citations omitted), we hold that nonapproved state regulation of occupational safety and health is-

---

*Mfrs. Assn.* v. *City of Akron*, 801 F. 2d 824, 828 (CA6 1986), appeal dism'd, 484 U. S. 801 (1987); *Five Migrant Farmworkers* v. *Hoffman*, 136 N. J. Super. 242, 247–248, 345 A. 2d 378, 381 (1975); *Columbus Coated Fabrics* v. *Industrial Comm'n of Ohio*, 1 OSHC 1361, 1362 (SD Ohio 1973); cf. *Florida Citrus Packers* v. *California*, 545 F. Supp. 216, 219–220 (ND Cal. 1982) (State may enforce modification to an approved plan pending approval by Secretary). See also S. Bokat & H. Thompson, Occupational Safety and Health Law 686, n. 28 (1988) ("Section 18(b) of the Act permits states to adopt more effective standards only through the vehicle of an approved state plan").

sues for which a federal standard is in effect is impliedly preempted as in conflict with the full purposes and objectives of the OSH Act, *Hines* v. *Davidowitz, supra.* The design of the statute persuades us that Congress intended to subject employers and employees to only one set of regulations, be it federal or state, and that the only way a State may regulate an OSHA-regulated occupational safety and health issue is pursuant to an approved state plan that displaces the federal standards.

The principal indication that Congress intended to preempt state law is § 18(b)'s statement that a State "shall" submit a plan if it wishes to "assume responsibility" for "development and enforcement . . . of occupational safety and health standards relating to any occupational safety or health issue with respect to which a Federal standard has been promulgated." The unavoidable implication of this provision is that a State may not enforce its own occupational safety and health standards without obtaining the Secretary's approval, and petitioner concedes that § 18(b) would require an approved plan if Illinois wanted to "assume responsibility" for the regulation of occupational safety and health within the State. Petitioner contends, however, that an approved plan is necessary only if the State wishes completely to replace the federal regulations, not merely to supplement them. She argues that the correct interpretation of § 18(b) is that posited by Judge Easterbrook below: *i. e.,* a State may either "oust" the federal standard by submitting a state plan to the Secretary for approval or "add to" the federal standard without seeking the Secretary's approval. 918 F. 2d, at 685 (Easterbrook, J., *dubitante*).

Petitioner's interpretation of § 18(b) might be plausible were we to interpret that provision in isolation, but it simply is not tenable in light of the OSH Act's surrounding provisions. "[W]e must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law." *Dedeaux, supra,* at 51 (internal quotation marks and

citations omitted). The OSH Act as a whole evidences Congress' intent to avoid subjecting workers and employers to duplicative regulation; a State may develop an occupational safety and health program tailored to its own needs, but only if it is willing completely to displace the applicable federal regulations.

Cutting against petitioner's interpretation of § 18(b) is the language of § 18(a), which saves from pre-emption any state law regulating an occupational safety and health issue with respect to which no federal standard is in effect. 29 U. S. C. § 667(a). Although this is a saving clause, not a pre-emption clause, the natural implication of this provision is that state laws regulating the same issue as federal laws are not saved, even if they merely supplement the federal standard. Moreover, if petitioner's reading of § 18(b) were correct, and if a State were free to enact nonconflicting safety and health regulations, then § 18(a) would be superfluous: There is no possibility of conflict where there is no federal regulation. Because "[i]t is our duty 'to give effect, if possible, to every clause and word of a statute,'" *United States* v. *Menasche,* 348 U. S. 528, 538–539 (1955) (quoting *Montclair* v. *Ramsdell,* 107 U. S. 147, 152 (1883)), we conclude that § 18(a)'s preservation of state authority in the absence of a federal standard presupposes a background pre-emption of all state occupational safety and health standards whenever a federal standard governing the same issue is in effect.

Our understanding of the implications of § 18(b) is likewise bolstered by § 18(c) of the Act, 29 U. S. C. § 667(c), which sets forth the conditions that must be satisfied before the Secretary can approve a plan submitted by a State under subsection (b). State standards that affect interstate commerce will be approved only if they "are required by compelling local conditions" and "do not unduly burden interstate commerce." § 667(c)(2). If a State could supplement federal regulations without undergoing the § 18(b) approval process, then the protections that § 18(c) offers to interstate com-

merce would easily be undercut. It would make little sense to impose such a condition on state programs intended to supplant federal regulation and not those that merely supplement it: The burden on interstate commerce remains the same.

Section 18(f) also confirms our view that States are not permitted to assume an enforcement role without the Secretary's approval, unless no federal standard is in effect. That provision gives the Secretary the authority to withdraw her approval of a state plan. 29 U.S.C. §667(f). Once approval is withdrawn, the plan "cease[s] to be in effect" and the State is permitted to assert jurisdiction under its occupational health and safety law only for those cases "commenced before the withdrawal of the plan." *Ibid.* Under petitioner's reading of §18(b), §18(f) should permit the continued exercise of state jurisdiction over purely "supplemental" and nonconflicting standards. Instead, §18(f) assumes that the State loses the power to enforce all of its occupational safety and health standards once approval is withdrawn.

The same assumption of exclusive federal jurisdiction in the absence of an approved state plan is apparent in the transitional provisions contained in §18(h) of the Act. 29 U.S.C. §667(h). Section 18(h) authorized the Secretary of Labor, during the first two years after passage of the Act, to enter into an agreement with a State by which the State would be permitted to continue to enforce its own occupational health and safety standards for two years or until final action was taken by the Secretary pursuant to §18(b), whichever was earlier. Significantly, §18(h) does not say that such an agreement is only necessary when the State wishes fully to supplant federal standards. Indeed, the original Senate version of the provision would have allowed a State to enter into such an agreement only when it wished to enforce standards "not in conflict with Federal occupational health and safety standards," a category which included "any State occupational health and safety standard which pro-

vides for more stringent health and safety regulations than do the Federal standards." S. 2193, § 17(h), reprinted in 116 Cong. Rec. 37637 (1970). Although that provision was eliminated from the final draft of the bill, thereby allowing agreements for the temporary enforcement of less stringent state standards, it is indicative of the congressional understanding that a State was required to enter into a transitional agreement even when its standards were stricter than federal standards. The Secretary's contemporaneous interpretation of §18(h) also expresses that understanding. See 29 CFR § 1901.2 (1972) ("Section 18(h) permits the Secretary to provide an alternative to the *exclusive Federal jurisdiction* [over] occupational safety and health issue[s]. This alternative is temporary and may be considered a step toward the more permanent alternative to *exclusive Federal jurisdiction* provided by sections 18(b) and (c) following submission and approval of a plan submitted by a State for the development and enforcement of occupational safety and health standards") (emphases added).

Looking at the provisions of §18 as a whole, we conclude that the OSH Act precludes any state regulation of an occupational safety or health issue with respect to which a federal standard has been established, unless a state plan has been submitted and approved pursuant to §18(b). Our review of the Act persuades us that Congress sought to promote occupational safety and health while at the same time avoiding duplicative, and possibly counterproductive, regulation. It thus established a system of uniform federal occupational health and safety standards, but gave States the option of pre-empting federal regulations by developing their own occupational safety and health programs. In addition, Congress offered the States substantial federal grant moneys to assist them in developing their own programs. See OSH Act §23, 29 U.S.C. §§ 672(a), (b), and (f) (for three years following enactment, the Secretary may award up to 90% of the costs to a State of developing a state occupational safety

and health plan); 29 U. S. C. § 672(g) (States that develop approved plans may receive funding for up to 50% of the costs of operating their occupational health and safety programs). To allow a State selectively to "supplement" certain federal regulations with ostensibly nonconflicting standards would be inconsistent with this federal scheme of establishing uniform federal standards, on the one hand, and encouraging States to assume full responsibility for development and enforcement of their own OSH programs, on the other.

We cannot accept petitioner's argument that the OSH Act does not pre-empt nonconflicting state laws because those laws, like the Act, are designed to promote worker safety. In determining whether state law "stands as an obstacle" to the full implementation of a federal law, *Hines* v. *Davidowitz*, 312 U. S., at 67, "it is not enough to say that the ultimate goal of both federal and state law" is the same, *International Paper Co.* v. *Ouellette*, 479 U. S. 481, 494 (1987). "A state law also is pre-empted if it interferes with the methods by which the federal statute was designed to reach th[at] goal." *Ibid.;* see also *Michigan Canners & Freezers Assn., Inc.* v. *Agricultural Marketing and Bargaining Bd.*, 467 U. S. 461, 477 (1984) (state statute establishing association to represent agricultural producers pre-empted even though it and the federal Agricultural Fair Practices Act "share the goal of augmenting the producer's bargaining power"); *Wisconsin Dept. of Industry* v. *Gould Inc.*, 475 U. S. 282, 286–287 (1986) (state statute preventing three-time violators of the National Labor Relations Act from doing business with the State is pre-empted even though state law was designed to reinforce requirements of federal Act). The OSH Act does not foreclose a State from enacting its own laws to advance the goal of worker safety, but it does restrict the ways in which it can do so. If a State wishes to regulate an issue of worker safety for which a federal standard is in effect, its

only option is to obtain the prior approval of the Secretary of Labor, as described in § 18 of the Act.[2]

## III

Petitioner next argues that, even if Congress intended to pre-empt all nonapproved state occupational safety and health regulations whenever a federal standard is in effect, the OSH Act's pre-emptive effect should not be extended to state laws that address public safety as well as occupational safety concerns. As we explained in Part II, we understand

---

[2] JUSTICE KENNEDY, while agreeing on the pre-emptive scope of the OSH Act, finds that its pre-emption is express rather than implied. *Post*, at 112 (KENNEDY, J., concurring in part and concurring in judgment). The Court's previous observation that our pre-emption categories are not "rigidly distinct," *English* v. *General Electric Co.*, 496 U. S. 72, 79, n. 5 (1990), is proved true by this case. We, too, are persuaded that the text of the Act provides the strongest indication that Congress intended the promulgation of a federal safety and health standard to pre-empt all non-approved state regulation of the same issue, but we cannot say that it rises to the level of express pre-emption. In the end, even JUSTICE KENNEDY finds express pre-emption by relying on the negative "inference" of § 18(b), which governs when *state* law will pre-empt *federal* law. *Post*, at 112. We cannot agree that the negative implications of the text, although ultimately dispositive to our own analysis, *expressly* address the issue of federal pre-emption of state law. We therefore prefer to place this case in the category of implied pre-emption. *Supra*, at 98–99. Although we have chosen to use the term "conflict" pre-emption, we could as easily have stated that the promulgation of a federal safety and health standard "pre-empts the field" for any nonapproved state law regulating the same safety and health issue. See *English, supra,* at 79–80, n. 5 ("[F]ield pre-emption may be understood as a species of conflict pre-emption: A state law that falls within a pre-empted field conflicts with Congress' intent (either express or plainly implied) to exclude state regulation"); *post*, at 116 (SOUTER, J., dissenting). Frequently, the pre-emptive "label" we choose will carry with it substantive implications for the scope of pre-emption. In this case, however, it does not. Our disagreement with JUSTICE KENNEDY as to whether the OSH Act's pre-emptive effect is labeled "express" or "implied" is less important than our agreement that the implications of the text of the statute evince a congressional intent to pre-empt nonapproved state regulations when a federal standard is in effect.

§ 18(b) to mean that the OSH Act pre-empts all state "occupational safety and health standards relating to any occupational safety or health issue with respect to which a Federal standard has been promulgated." 29 U. S. C. § 667(b). We now consider whether a dual impact law can be an "occupational safety and health standard" subject to pre-emption under the Act.

The OSH Act defines an "occupational safety and health standard" as "a standard which requires conditions, or the adoption or use of one or more practices, means, methods, operations, or processes, reasonably necessary or appropriate to provide safe or healthful employment and places of employment." 29 U. S. C. § 652(8). Any state law requirement designed to promote health and safety in the workplace falls neatly within the Act's definition of an "occupational safety and health standard." Clearly, under this definition, a state law that expressly declares a legislative purpose of regulating occupational health and safety would, in the absence of an approved state plan, be pre-empted by an OSHA standard regulating the same subject matter. But petitioner asserts that if the state legislature articulates a purpose other than (or in addition to) workplace health and safety, then the OSH Act loses its pre-emptive force. We disagree.

Although "part of the pre-empted field is defined by reference to the purpose of the state law in question, . . . another part of the field is defined by the state law's actual effect." *English* v. *General Electric Co.*, 496 U. S. 72, 84 (1990) (citing *Pacific Gas & Elec. Co.* v. *State Energy Resources Conservation and Development Comm'n*, 461 U. S. 190, 212–213 (1983)). In assessing the impact of a state law on the federal scheme, we have refused to rely solely on the legislature's professed purpose and have looked as well to the effects of the law. As we explained over two decades ago:

"We can no longer adhere to the aberrational doctrine . . . that state law may frustrate the operation of federal

law as long as the state legislature in passing its law had some purpose in mind other than one of frustration. Apart from the fact that it is at odds with the approach taken in nearly all our Supremacy Clause cases, such a doctrine would enable state legislatures to nullify nearly all unwanted federal legislation by simply publishing a legislative committee report articulating some state interest or policy—other than frustration of the federal objective—that would be tangentially furthered by the proposed state law. . . . [A]ny state legislation which frustrates the full effectiveness of federal law is rendered invalid by the Supremacy Clause." *Perez* v. *Campbell*, 402 U. S., at 651–652.

See also *Florida Lime & Avocado Growers, Inc.* v. *Paul*, 373 U. S., at 141–142 (focus on "whether the purposes of the two laws are parallel or divergent" tends to "obscure more than aid" in determining whether state law is pre-empted by federal law) (emphasis deleted); *Hughes* v. *Oklahoma*, 441 U. S. 322, 336 (1979) ("[W]hen considering the purpose of a challenged statute, this Court is not bound by '[t]he name, description or characterization given it by the legislature or the courts of the State,' but will determine for itself the practical impact of the law") (quoting *Lacoste* v. *Department of Conservation of Louisiana*, 263 U. S. 545, 550 (1924)); *Napier* v. *Atlantic Coast Line R. Co.*, 272 U. S. 605, 612 (1926) (pre-emption analysis turns not on whether federal and state laws "are aimed at distinct and different evils" but whether they "operate upon the same object").

Our precedents leave no doubt that a dual impact state regulation cannot avoid OSH Act pre-emption simply because the regulation serves several objectives rather than one. As the Court of Appeals observed, "[i]t would defeat the purpose of section 18 if a state could enact measures stricter than OSHA's and largely accomplished through regulation of worker health and safety simply by asserting a nonoccupational purpose for the legislation." 918 F. 2d, at 679.

Whatever the purpose or purposes of the state law, pre-emption analysis cannot ignore the effect of the challenged state action on the pre-empted field. The key question is thus at what point the state regulation sufficiently interferes with federal regulation that it should be deemed pre-empted under the Act.

In *English* v. *General Electric Co., supra,* we held that a state tort claim brought by an employee of a nuclear-fuels production facility against her employer was not pre-empted by a federal whistle-blower provision because the state law did not have a "direct and substantial effect" on the federal scheme. *Id.,* at 85. In the decision below, the Court of Appeals relied on *English* to hold that, in the absence of the approval of the Secretary, the OSH Act pre-empts all state law that "constitutes, in a direct, clear and substantial way, regulation of worker health and safety." 918 F. 2d, at 679. We agree that this is the appropriate standard for determining OSH Act pre-emption. On the other hand, state laws of general applicability (such as laws regarding traffic safety or fire safety) that do not conflict with OSHA standards and that regulate the conduct of workers and nonworkers alike would generally not be pre-empted. Although some laws of general applicability may have a "direct and substantial" effect on worker safety, they cannot fairly be characterized as "occupational" standards, because they regulate workers simply as members of the general public. In this case, we agree with the court below that a law directed at workplace safety is not saved from pre-emption simply because the State can demonstrate some additional effect outside of the workplace.

In sum, a state law requirement that directly, substantially, and specifically regulates occupational safety and health is an occupational safety and health standard within the meaning of the Act. That such a law may also have a nonoccupational impact does not render it any less of an occupational standard for purposes of pre-emption analysis.

If the State wishes to enact a dual impact law that regulates an occupational safety or health issue for which a federal standard is in effect, § 18 of the Act requires that the State submit a plan for the approval of the Secretary.

## IV

We recognize that "the States have a compelling interest in the practice of professions within their boundaries, and that as part of their power to protect the public health, safety, and other valid interests they have broad power to establish standards for licensing practitioners and regulating the practice of professions." *Goldfarb* v. *Virginia State Bar*, 421 U. S. 773, 792 (1975); see also *Ferguson* v. *Skrupa*, 372 U. S. 726, 731 (1963); *Dent* v. *West Virginia*, 129 U. S. 114, 122 (1889). But under the Supremacy Clause, from which our pre-emption doctrine is derived, " 'any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield.' " *Felder* v. *Casey*, 487 U. S., at 138 (quoting *Free* v. *Bland*, 369 U. S. 663, 666 (1962)); see also *De Canas* v. *Bica*, 424 U. S. 351, 357 (1976) ("[E]ven state regulation designed to protect vital state interests must give way to paramount federal legislation"). We therefore reject petitioner's argument that the State's interest in licensing various occupations can save from OSH Act pre-emption those provisions that directly and substantially affect workplace safety.

We also reject petitioner's argument that the Illinois licensing acts do not regulate occupational safety and health at all, but are instead a "pre-condition" to employment. By that reasoning, the OSHA regulations themselves would not be considered occupational standards. SARA, however, makes clear that the training of employees engaged in hazardous waste operations is an occupational safety and health issue, and that certification requirements before an employee may engage in such work are occupational safety and health standards. See *supra*, at 92. Because nei-

ther of the OSH Act's saving provisions are implicated, and because Illinois does not have an approved state plan under § 18(b), the state licensing acts are pre-empted by the OSH Act to the extent they establish occupational safety and health standards for training those who work with hazardous wastes. Like the Court of Appeals, we do not specifically consider which of the licensing acts' provisions will stand or fall under the pre-emption analysis set forth above.

The judgment of the Court of Appeals is hereby

*Affirmed.*

JUSTICE KENNEDY, concurring in part and concurring in the judgment.

Though I concur in the Court's judgment and with the ultimate conclusion that the state law is pre-empted, I would find express pre-emption from the terms of the federal statute. I cannot agree that we should denominate this case as one of implied pre-emption. The contrary view of the plurality is based on an undue expansion of our implied pre-emption jurisprudence which, in my view, is neither wise nor necessary.

As both the majority and dissent acknowledge, we have identified three circumstances in which a federal statute pre-empts state law: First, Congress can adopt express language defining the existence and scope of pre-emption. Second, state law is pre-empted where Congress creates a scheme of federal regulation so pervasive as to leave no room for supplementary state regulation. And third, "state law is pre-empted to the extent that it actually conflicts with federal law." *English* v. *General Electric Co.*, 496 U. S. 72, 78–79 (1990); *ante*, at 98; *post*, at 115. This third form of pre-emption, so-called actual conflict pre-emption, occurs either "where it is impossible for a private party to comply with both state and federal requirements . . . or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Eng-*

*lish, supra,* at 79 (quoting *Hines* v. *Davidowitz,* 312 U. S. 52, 67 (1941)). The plurality would hold today that state occupational safety and health standards regulating an issue on which a federal standard exists conflict with Congress' purpose to "subject employers and employees to only one set of regulations." *Ante,* at 99. This is not an application of our pre-emption standards, it is but a conclusory statement of pre-emption, as it assumes that Congress intended exclusive federal jurisdiction. I do not see how such a mode of analysis advances our consideration of the case.

Our decisions establish that a high threshold must be met if a state law is to be pre-empted for conflicting with the purposes of a federal Act. Any conflict must be "irreconcilable . . . . The existence of a hypothetical or potential conflict is insufficient to warrant the pre-emption of the state statute." *Rice* v. *Norman Williams Co.,* 458 U. S. 654, 659 (1982); see also *English, supra,* at 90 ("The 'teaching of this Court's decisions . . . enjoin[s] seeking out conflicts between state and federal regulation where none clearly exists'" (quoting *Huron Portland Cement Co.* v. *Detroit,* 362 U. S. 440, 446 (1960)); *Pacific Gas & Elec. Co.* v. *State Energy Resources Conservation and Development Comm'n,* 461 U. S. 190, 222–223 (1983). In my view, this type of pre-emption should be limited to state laws which impose prohibitions or obligations which are in direct contradiction to Congress' primary objectives, as conveyed with clarity in the federal legislation.

I do not believe that supplementary state regulation of an occupational safety and health issue can be said to create the sort of actual conflict required by our decisions. The purpose of state supplementary regulation, like the federal standards promulgated by the Occupational Safety and Health Administration (OSHA), is to protect worker safety and health. Any potential tension between a scheme of federal regulation of the workplace and a concurrent, supplementary state scheme would not, in my view, rise to the level

of "actual conflict" described in our pre-emption cases. Absent the express provisions of § 18 of the Occupational Safety and Health Act of 1970 (OSH Act), 29 U. S. C. § 667, .I would not say that state supplementary regulation conflicts with the purposes of the OSH Act, or that it " 'interferes with the methods by which the federal statute was designed to reach [its] goal.' " *Ante,* at 103 (quoting *International Paper Co.* v. *Ouellette,* 479 U. S. 481, 494 (1987)).

The plurality's broad view of actual conflict pre-emption is contrary to two basic principles of our pre-emption jurisprudence. First, we begin "with the assumption that the historic police powers of the States [are] not to be superseded . . . unless that was the clear and manifest purpose of Congress." *Rice* v. *Santa Fe Elevator Corp.,* 331 U. S. 218, 230 (1947); see also *ante,* at 96. Second, " '[t]he purpose of Congress is the ultimate touchstone' " in all pre-emption cases. *Malone* v. *White Motor Corp.,* 435 U. S. 497, 504 (1978) (quoting *Retail Clerks* v. *Schermerhorn,* 375 U. S. 96, 103 (1963)). A freewheeling judicial inquiry into whether a state statute is in tension with federal objectives would undercut the principle that it is Congress rather than the courts that pre-empts state law.

Nonetheless, I agree with the Court that "the OSH Act pre-empts all state 'occupational safety and health standards relating to any occupational safety or health issue with respect to which a Federal standard has been promulgated.' " *Ante,* at 105 (quoting 29 U. S. C. § 667(b)). I believe, however, that this result is mandated by the express terms of § 18(b) of the OSH Act. It follows from this that the pre-emptive scope of the Act is also limited to the language of the statute. When the existence of pre-emption is evident from the statutory text, our inquiry must begin and end with the statutory framework itself.

A finding of express pre-emption in this case is not contrary to our longstanding rule that we will not infer pre-emption of the States' historic police powers absent a clear

statement of intent by Congress. *Rice* v. *Santa Fe Elevator Corp., supra,* at 230; *Jones* v. *Rath Packing Co.,* 430 U. S. 519, 525 (1977); *English,* 496 U. S., at 79. Though most statutes creating express pre-emption contain an explicit statement to that effect, a statement admittedly lacking in § 18(b), we have never required any particular magic words in our express pre-emption cases. Our task in all pre-emption cases is to enforce the "clear and manifest purpose of Congress." *Rice* v. *Santa Fe Elevator Corp., supra,* at 230. We have held, in express pre-emption cases, that Congress' intent must be divined from the language, structure, and purposes of the statute as a whole. *Ingersoll-Rand Co.* v. *McClendon,* 498 U. S. 133, 138 (1990); *Pilot Life Ins. Co.* v. *Dedeaux,* 481 U. S. 41, 51 (1987). The language of the OSH statute sets forth a scheme in light of which the provisions of § 18 must be interpreted, and from which the express pre-emption that displaces state law follows.

As the plurality's analysis amply demonstrates, *ante,* at 98–103, Congress has addressed the issue of pre-emption in the OSH Act. The dissent's position that the Act does not pre-empt supplementary state regulation becomes most implausible when the language of § 18(b) is considered in conjunction with the other provisions of § 18. Section 18(b) provides as follows:

> "Any State which . . . desires to assume responsibility for development and enforcement therein of occupational safety and health standards relating to any occupational safety or health issue with respect to which a Federal standard has been promulgated . . . *shall* submit a State plan . . . ." 29 U. S. C. § 667(b) (emphasis added).

The statute is clear: When a State desires to assume responsibility for an occupational safety and health issue already addressed by the Federal Government, it must submit a state plan. The most reasonable inference from this language is that when a State does not submit and secure ap-

proval of a state plan, it may not enforce occupational safety and health standards in that area. Any doubt that this is what Congress intended disappears when subsection (b) is considered in conjunction with subsections (a), (c), and (f). *Ante*, at 100–101. I will not reiterate the plurality's persuasive discussion on this point. Unartful though the language of §18(b) may be, the structure and language of §18 leave little doubt that in the OSH statute Congress intended to pre-empt supplementary state regulation of an occupational safety and health issue with respect to which a federal standard exists.

In this regard I disagree with the dissent, see *post*, p. 114, and find unconvincing its conclusion that Congress intended to allow concurrent state and federal jurisdiction over occupational safety and health issues. The dissent would give the States, rather than the Federal Government, the power to decide whether as to any particular occupational safety and health issue there will exist a single or dual regulatory scheme. Under this theory the State may choose exclusive federal jurisdiction by not regulating; or exclusive state jurisdiction by submitting a state plan; or dual regulation by adopting supplementary rules, as Illinois did here. That position undermines the authority of OSHA in many respects. For example, §18(c)(2) of the OSH Act allows OSHA to disapprove state plans which "unduly burden interstate commerce." The dissent would eviscerate this important administrative mechanism by allowing the States to sidestep OSHA's authority through the mechanism of supplementary regulation. See *post*, at 118–121. Furthermore, concurrent state and federal jurisdiction might interfere with the enforcement of the federal regulations without creating a situation where compliance with both schemes is a physical impossibility, which the dissent would require for pre-emption. *Post*, at 121; see also Brief for Respondent 32–33. I would not attribute to Congress the intent to create such a hodgepodge scheme of authority. My views in

this regard are confirmed by the fact that OSHA has as a consistent matter, since the enactment of the OSH Act, viewed § 18 as providing it with exclusive jurisdiction in areas where it issues a standard. 29 CFR § 1901.2 (1991); 36 Fed. Reg. 7006 (1971); Brief for United States as *Amicus Curiae* 12–21. Therefore, while the dissent may be correct that as a theoretical matter the separate provisions of § 18 may be reconciled with allowing concurrent jurisdiction, it is neither a natural nor a sound reading of the statutory scheme.

The necessary implication of finding express pre-emption in this case is that the pre-emptive scope of the OSH Act is defined by the language of § 18(b). Because this provision requires federal approval of state occupational safety and health standards alone, only state laws fitting within that description are pre-empted. For that reason I agree with the Court that state laws of general applicability are not pre-empted. *Ante,* at 107. I also agree that "a state law requirement that directly, substantially, and specifically regulates occupational safety and health is an occupational safety and health standard within the meaning of the Act," *ibid.,* and therefore falls within the scope of pre-emption. So-called "dual impact" state regulations which meet this standard are pre-empted by the OSH Act, regardless of any additional purpose the law may serve, or effect the law may have, outside the workplace. As a final matter, I agree that the Illinois Acts are not saved because they operate through a licensing mechanism rather than through direct regulation of the workplace. I therefore join all but Part II of the Court's opinion, and concur in the judgment of the Court.

JUSTICE SOUTER, with whom JUSTICE BLACKMUN, JUSTICE STEVENS, and JUSTICE THOMAS join, dissenting.

The Court holds today that § 18 of the Occupational Safety and Health Act of 1970 (Act), 29 U. S. C. § 667, pre-empts state regulation of any occupational safety or health issue as

to which there is a federal standard, whether or not the state regulation conflicts with the federal standard in the sense that enforcement of one would preclude application of the other. With respect, I dissent. In light of our rule that federal pre-emption of state law is only to be found in a clear congressional purpose to supplant exercises of the States' traditional police powers, the text of the Act fails to support the Court's conclusion.

I

Our cases recognize federal pre-emption of state law in three variants: express pre-emption, field pre-emption, and conflict pre-emption. Express pre-emption requires "explicit pre-emptive language." See *Pacific Gas & Elec. Co.* v. *State Energy Resources Conservation and Development Comm'n*, 461 U. S. 190, 203 (1983), citing *Jones* v. *Rath Packing Co.*, 430 U. S. 519, 525 (1977). Field pre-emption is wrought by a manifestation of congressional intent to occupy an entire field such that even without a federal rule on some particular matter within the field, state regulation on that matter is pre-empted, leaving it untouched by either state or federal law. 461 U. S., at 204. Finally, there is conflict pre-emption in either of two senses. The first is found when compliance with both state and federal law is impossible, *ibid.*, the second when a state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines* v. *Davidowitz*, 312 U. S. 52, 67 (1941).

The plurality today finds pre-emption of this last sort, discerning a conflict between any state legislation on a given issue as to which a federal standard is in effect, and a congressional purpose "to subject employers and employees to only one set of regulations." *Ante*, at 99. Thus, under the plurality's reading, any regulation on an issue as to which a federal standard has been promulgated has been pre-empted. As one commentator has observed, this kind of purpose-conflict pre-emption, which occurs when state law is held to

"undermin[e] a congressional decision in favor of national uniformity of standards," presents "a situation similar in practical effect to that of federal occupation of a field." L. Tribe, American Constitutional Law 486 (2d ed. 1988). Still, whether the pre-emption at issue is described as occupation of each narrow field in which a federal standard has been promulgated, as pre-emption of those regulations that conflict with the federal objective of single regulation, or, as JUSTICE KENNEDY describes it, as express pre-emption, see *ante*, at 111 (opinion concurring in part and concurring in judgment), the key is congressional intent, and I find the language of the statute insufficient to demonstrate an intent to pre-empt state law in this way.

## II

Analysis begins with the presumption that "Congress did not intend to displace state law." *Maryland* v. *Louisiana*, 451 U. S. 725, 746 (1981). "Where, as here, the field which Congress is said to have pre-empted has been traditionally occupied by the States, see, *e. g.*, U. S. Const., Art. I, § 10; *Patapsco Guano Co.* v. *North Carolina*, 171 U. S. 345, 358 (1898), 'we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' *Rice* v. *Santa Fe Elevator Corp.*, 331 U. S. 218, 230 (1947). This assumption provides assurance that the 'federal-state balance,' *United States* v. *Bass*, 404 U. S. 336, 349 (1971), will not be disturbed unintentionally by Congress or unnecessarily by the courts. But when Congress has 'unmistakably . . . ordained,' *Florida Lime & Avocado Growers, Inc.* v. *Paul*, 373 U. S. 132, 142 (1963), that its enactments alone are to regulate a part of commerce, state laws regulating that aspect of commerce must fall." *Jones, supra*, at 525. Subject to this principle, the enquiry into the possibly pre-emptive effect of federal legislation is an exercise of statutory construction. If the statute's terms can be read sensi-

bly not to have a pre-emptive effect, the presumption controls and no pre-emption may be inferred.

## III

At first blush, respondent's strongest argument might seem to rest on § 18(a) of the Act, 29 U. S. C. § 667(a), the full text of which is this:

> "(a) Assertion of State standards in absence of applicable Federal standards
>
> "Nothing in this chapter shall prevent any State agency or court from asserting jurisdiction under State law over any occupational safety or health issue with respect to which no standard is in effect under section 655 of this title."

That is to say, where there is no federal standard in effect, there is no pre-emption. The plurality reasons that there must be pre-emption, however, when there is a federal standard in effect, else § 18(a) would be rendered superfluous because "[t]here is no possibility of conflict where there is no federal regulation." *Ante*, at 100.

The plurality errs doubly. First, its premise is incorrect. In the sense in which the plurality uses the term, there is the possibility of "conflict" even absent federal regulation since the mere enactment of a federal law like the Act may amount to an occupation of an entire field, preventing state regulation. Second, the necessary implication of § 18(a) is not that every federal regulation pre-empts all state law on the issue in question, but only that some federal regulations may pre-empt some state law. The plurality ignores the possibility that the provision simply rules out field pre-emption and is otherwise entirely compatible with the possibility that pre-emption will occur only when actual conflict between a federal regulation and a state rule renders compliance with both impossible. Indeed, if Congress had meant to say that any state rule should be pre-empted if it deals

with an issue as to which there is a federal regulation in effect, the text of subsection (a) would have been a very inept way of trying to make the point. It was not, however, an inept way to make the different point that Congress intended no field pre-emption of the sphere of health and safety subject to regulation, but not necessarily regulated, under the Act. Unlike the case where field pre-emption occurs, the provision tells us, absence of a federal standard leaves a State free to do as it will on the issue. Beyond this, subsection (a) does not necessarily mean anything, and the provision is perfectly consistent with the conclusion that as long as compliance with both a federal standard and a state regulation is not physically impossible, see *Florida Lime & Avocado Growers, Inc.* v. *Paul,* 373 U. S. 132, 142–143 (1963), each standard shall be enforceable. If, indeed, the presumption against pre-emption means anything, § 18(a) must be read in just this way.

Respondent also relies on § 18(b), 29 U. S. C. § 667(b):

> "(b) Submission of State plan for development and enforcement of State standards to preempt applicable Federal standards
>
> "Any State which, at any time, desires to assume responsibility for development and enforcement therein of occupational safety and health standards relating to any occupational safety or health issue with respect to which a Federal standard has been promulgated under section 655 of this title shall submit a State plan for the development of such standards and their enforcement."

Respondent argues that the necessary implication of this provision is clear: the only way that a state rule on a particular occupational safety and health issue may be enforced once a federal standard on the issue is also in place is by incorporating the state rule in a plan approved by the Secretary.

As both the plurality and JUSTICE KENNEDY acknowledge, however, that is not the necessary implication of § 18(b).

See *ante*, at 99 (plurality opinion); *ante*, at 112–113 (opinion concurring in part and concurring in judgment). The subsection simply does not say that unless a plan is approved, state law on an issue is pre-empted by the promulgation of a federal standard. In fact it tugs the other way, and in actually providing a mechanism for a State to "assume responsibility" for an issue with respect to which a federal standard has been promulgated (that is, to pre-empt federal law), § 18(b) is far from pre-emptive of anything adopted by the States. Its heading, enacted as part of the statute and properly considered under our canons of construction for whatever light it may shed, see, *e. g., Strathearn S. S. Co.* v. *Dillon,* 252 U. S. 348, 354 (1920); *FTC* v. *Mandel Brothers, Inc.,* 359 U. S. 385 (1959), speaks expressly of the "development and enforcement of State standards to preempt applicable Federal standards." The provision does not in any way provide that absent such state pre-emption of federal rules, the State may not even supplement the federal standards with consistent regulations of its own. Once again, nothing in the provision's language speaks one way or the other to the question whether promulgation of a federal standard pre-empts state regulation, or whether, in the absence of a plan, consistent federal and state regulations may coexist. The provision thus makes perfect sense on the assumption that a dual regulatory scheme is permissible but subject to state pre-emption if the State wishes to shoulder enough of the federal mandate to gain approval of a plan.

Nor does the provision setting out conditions for the Secretary's approval of a plan indicate that a state regulation on an issue federally addressed is never enforceable unless incorporated in a plan so approved. Subsection (c)(2) requires the Secretary to approve a plan when in her judgment, among other things, it will not "unduly burden interstate commerce." 29 U. S. C. § 667(c)(2). Respondent argues, and the plurality concludes, that if state regulations were not pre-empted, this provision would somehow suggest

that States acting independently could enforce regulations that did burden interstate commerce unduly. Brief for Respondent 17; see *ante*, at 100–101. But this simply does not follow. The subsection puts a limit on the Secretary's authority to approve a plan that burdens interstate commerce, thus capping the discretion that might otherwise have been read into the congressional delegation of authority to the Secretary to approve state plans. From this restriction applying only to the Secretary's federal authority it is clearly a non sequitur to conclude that pre-emption must have been intended to avoid the equally objectionable undue burden that independent state regulation might otherwise impose. Quite the contrary; the dormant Commerce Clause can take care of that, without any need to assume pre-emption.

The final provision that arguably suggests pre-emption merely by promulgation of a federal standard is § 18(h), 29 U. S. C. § 667(h):

> "(h) Temporary enforcement of State standards
>
> "The Secretary may enter into an agreement with a State under which the State will be permitted to continue to enforce one or more occupational health and safety standards in effect in such State until final action is taken by the Secretary with respect to a plan submitted by a State under subsection (b) of this section, or two years from December 29, 1970, whichever is earlier."

This provision of course expired in 1972, but its language may suggest something about the way Congress understood the rest of § 18. Since, all are agreed, a State would not have had reason to file a plan unless a federal standard was in place, § 18(h) necessarily refers to a situation in which there is a federal standard. Respondent argues that the provision for agreements authorizing continued enforcement of a state standard following adoption of a federal standard on the issue it addresses implies that, absent such agree-

ment, a State would have been barred from enforcing any standard of its own.

Once again, however, that is not the necessary implication of the text. A purely permissive provision for enforcement of state regulations does not imply that all state regulations are otherwise unenforceable. All it necessarily means is that the Secretary could agree to permit the State for a limited time to enforce whatever state regulations would otherwise have been pre-empted, as would have been true when they actually so conflicted with the federal standard that an employer could not comply with them and still comply with federal law as well. Thus, in the case of a State wishing to submit a plan, the provision as I read it would have allowed for the possibility of just one transition, from the pre-Act state law to the post-Act state plan. Read as the Court reads it, however, employers and employees in such a State would have been subjected first to state law on a given issue; then, after promulgation of a federal standard, to that standard; and then, after approval of the plan, to a new state regime. One enforced readjustment would have been better than two, and the statute is better read accordingly.*

## IV

In sum, our rule is that the traditional police powers of the State survive unless Congress has made a purpose to

---

*The plurality also relies on § 18(f), 29 U. S. C. § 667(f), which deals with withdrawal of approval of a state plan. See *ante*, at 101. The section provides that "the State may retain jurisdiction in any case commenced before the withdrawal of the plan in order to enforce standards under the plan whenever the issues involved do not relate to the reasons for the withdrawal of the plan." The plurality is mistaken in concluding that § 18(f) "assumes that the State loses the power to enforce all of its occupational safety and health standards once approval is withdrawn." *Ibid.* At most it assumes that the State loses its capacity to enforce the plan (except for pending cases). It says nothing about state law that may remain on the books exclusive of the plan's authority, or about new law enacted after withdrawal of the Secretary's approval.

pre-empt them clear. See *Rice,* 331 U. S., at 230. The Act does not, in so many words, pre-empt all state regulation of issues on which federal standards have been promulgated, and respondent's contention at oral argument that reading subsections (a), (b), and (h) could leave no other "logical" conclusion but one of pre-emption is wrong. Each provision can be read consistently with the others without any implication of pre-emptive intent. See *National Solid Wastes Management Assn.* v. *Killian,* 918 F. 2d 671, 685–688 (CA7 1990) (Easterbrook, J., *dubitante*). They are in fact just as consistent with a purpose and objective to permit overlapping state and federal regulation as with one to guarantee that employers and employees would be subjected to only one regulatory regime. Restriction to one such regime by precluding supplemental state regulation might or might not be desirable. But in the absence of any clear expression of congressional intent to pre-empt, I can only conclude that, as long as compliance with federally promulgated standards does not render obedience to Illinois' regulations impossible, the enforcement of the state law is not prohibited by the Supremacy Clause. I respectfully dissent.