2003 ME 46

**Jerald SMITH**

v.

**TOWN OF PITTSTON**

.

Supreme Judicial Court of Maine.

Argued: Sept. 11, 2002.
Decided: April 7, 2003.

James E. Mitchell, (orally), Jim Mitchell and Jed Davis, P.A., Augusta, for plaintiff.

Gregory M. Cunningham, (orally), Bernstein, Shur, Sawyer & Nelson, P.A., Portland, (for Town of Pittston), Thomas B. Federle, Esq., Dyer Goodall & Federle, LLC, Augusta, (for intervenors), for defendants.

Panel: SAUFLEY, C.J., and CLIFFORD, RUDMAN, DANA, ALEXANDER, CALKINS, and LEVY, JJ.

Majority: CLIFFORD, RUDMAN, ALEXANDER, and CALKINS, JJ.

Dissenting: SAUFLEY, C.J., and DANA, and LEVY, JJ.

RUDMAN, J.

[¶ 1] The Town of Pittston appeals from the summary judgment entered and the injunctive relief granted by the Superior Court, (Kennebec County, *Marden, J.*), declaring the Town's ordinance, which prohibited the spreading of septage, illegal because it is preempted by state law. The Town asserts that its ordinance is not preempted by state statute but, rather, it is within the police powers granted to it by the state constitutional amendments and statutes extending "Home Rule" to the Towns. Jerald Smith cross-appeals, arguing that the Superior Court erred, first, when it concluded that Smith's application for septage spreading was "moot" because the court had invalidated the Town's ordinance, and second, when the court denied Smith injunctive relief requiring the Town to consider Smith's application before it passed another moratorium. We agree with the Town that its ordinance prohibiting the spread of septage does not violate state law. We, therefore, vacate the judgment of the Superior Court and remand for entry of judgment in favor of the Town.

## I. BACKGROUND

[¶ 2] In April 1999, Smith attended the monthly meeting of the Town of Pittston's municipal officers seeking permission to spread septage over property he was in the process of purchasing. At that time, the Town of Pittston did not have an ordinance controlling the spreading of septage. Smith returned to the May 1999 meeting of the municipal officers, and was referred

to the Planning Board to file a new business permit application.

[¶ 3] Smith appeared before the Planning Board at its May 27, 1999, meeting and was directed to file an application for consideration at its June meeting. The Planning Board, however, conducted a site visit of the Hunts Meadow Road property Smith held under contract, contingent upon his receiving the permit. At the June 24, 1999, meeting of the Planning Board, Smith presented a new business application, an incomplete site plan review application, and a copy of a Department of Environmental Protection (DEP) application for a permit to spread septage. Smith also paid a twenty-five dollar application fee. The Planning Board tabled action on Smith's application pending its receipt of "legal advice from the Maine Municipal Association (MMA) as to the legal requirements for septage spreading applications." The MMA advised the Planning Board that the municipal officers were the appropriate reviewing body for a septage spreading permit application.

[¶ 4] The municipal officers, on June 23, 1999, certified a petition for a 180–day moratorium on septage spreading to be placed on a warrant at a special Town meeting. On July 28, 1999, the day Smith purchased the property, the voters approved a 180–day moratorium on permits for septage spreading. At their August 4, 1999, meeting, Smith asked that the municipal officers cause his application to be reviewed by DEP prior to the Town's review. The municipal officers declined to act because of the moratorium.

[¶ 5] In October 1999, the Town certified a petition for the Town's first septage ordinance. This proposed ordinance prohibited the "spreading, storing, or dumping of septage in the Town of Pittston" unless approved by the voters of the Town of Pittston. The ordinance also established a minimal performance criteria tied to state statutes and DEP rules, and required the operator to have a monitoring system.

[¶ 6] On November 24, 1999, Smith submitted another DEP septage spreading permit application to the municipal officers for referral to the DEP for review. The parties dispute whether this is the first complete application. Smith contends that the Town officials never faulted Smith's application for incompleteness and that, in fact, one of the Planning Board members indicated what Smith needed to do to complete the June 1999 application. The Town contends that Smith's November application is his only application.

[¶ 7] At a special Town meeting on December 22, 1999, the voters approved the proposed ordinance. That same day, Town officials forwarded Smith's septage spreading application for DEP review. The Town clerk certified a second petition for a warrant article for a second septage ordinance on January 10, 2000, and the voters approved the second ordinance at a special Town meeting on March 18, 2000. In addition to reiterating the prohibition on new septage spreading applications and having an effective date of January 10, 2000, this second ordinance established a fee schedule, a septage monitoring board, and revised and expanded performance criteria.

[¶ 8] On January 6, 2000, the DEP returned Smith's septage spreading permit application because it was incomplete. Smith returned to the municipal officers on February 2, 2000, and requested that his revised application be forwarded to the DEP for review.

[¶ 9] The voters adopted this second ordinance at a special Town meeting on March 18 and voted to appropriate $10,000 to reimburse the Town residents who expended funds to draft and defend the first

septage ordinance, and to enter into a septage disposal contract with Interstate Septic Systems to comply with 38 M.R.S.A. § 1305(6) (2001).

[¶ 10] The municipal officers voted to disburse those funds on May 24, 2000. The Town approved a third septage ordinance at a special Town meeting on October 19, 2000. This third ordinance (Ordinance III) replaced the previous two and contained a retroactive date making it effective as of July 23, 1999. Among other requirements, the new ordinance boosted the annual renewal fee to $5,000 per year.

[¶ 11] The DEP approved Smith's permit application on May 15, 2001, granted a five-year license, and set performance requirements and license conditions. Of the almost twenty-five acres Smith proposed to use, the DEP permitted Smith to spread septage on approximately eighteen acres in two separate areas.

[¶ 12] On May 25, 2001, Smith asked the Town to comply with the statute and approve his application, contending that the subsequently adopted ordinance did not apply to his application. The Town replied that its ordinance, adopted in October 2000, prohibited the spreading of septage and as a result the Town would not comply with the statute or consider Smith's request for a permit.

[¶ 13] On December 21, 1999, Smith filed his first three-count complaint against the Town seeking a declaratory judgment that the first Town ordinance violated state law. Smith amended his complaint on May 25, 2000, seeking a declaration that the second ordinance was illegal and demanding that the Town be reimbursed the $10,000 expended in litigation costs.

[¶ 14] After several months of discovery, the Town moved for a summary judgment on January 10, 2001. Smith then further amended his complaint to incorporate twelve counts seeking declaratory and injunctive relief declaring the Town's ordinances illegal and enjoining their application to Smith's permit application.

[¶ 15] The Superior Court entered a summary judgment in favor of the Town on Smith's first eight counts; the first five counts addressed the previous two ordinances, and the three other counts, which the court denied because Smith did not show a particularized injury, addressed Smith's claims about the Town's appropriations. The court reserved judgment on the final four counts pending further briefing and pleading by the parties. Nonetheless, the court did expressly indicate in dicta how it expected to rule on the legality of Ordinance III. The court suggested that the Town's ordinance is preempted by the state statute, concluding "[m]unicipalities may regulate but not prohibit the spreading and dumping of septage."

[¶ 16] On February 5, 2002, the court issued its second opinion entering a summary judgment in favor of Smith on his claim that the Town's ordinance violated state law (Count IX). The court granted the Town a summary judgment on Count XI of Smith's complaint, thereby upholding the saving clause of Ordinance III, which repealed the previous two ordinances.[1] The court concluded that it did not need to decide whether Smith's application was a "pending" application:

> This decision renders moot the plaintiff's argument that his application was pending prior to passage of the Town's septage spreading ban. The governing statute directs a municipality without ordinances dealing with septage to follow the DEP guidelines. 38 M.R.S.A.

1. Smith and the Town agreed separately to dismiss Count X, which sought a declaration that Ordinance III was overbroad and could not be enforced, without prejudice.

§ 1305(6). As this court's order will leave the Town without a valid septage ordinance, the municipal officers under DEP siting and design guidelines may review the plaintiff's application.

[¶ 17] After the court issued its second order, Smith sought the court's reconsideration of whether his application was "moot" and sought a temporary restraining order (TRO) against the Town to keep the Town from adopting another moratorium. Smith indicated in his affidavit that he requested the Pittston municipal officers to review his application approved by the DEP, but the municipal officers declined to do so on the ground that a special Town meeting was scheduled a week later to consider another moratorium. The court denied the motion for reconsideration. It ruled that it would not grant Smith a TRO against the Town from passing another moratorium, but enjoined the Town from enforcing the moratorium, which was scheduled to be considered by the voters on the same day as the TRO hearing. Moreover, the court concluded,

> [t]his court is satisfied that, as a matter of law, implementation of a 180–day moratorium in light of the stay provided on judgments of appeal would constitute significant disruption of the status quo as to the relationship of these parties with respect to the subject matter. The court further concluded, in light of all the evidence in this case, that the moratorium is presented in bad faith and as a deliberate attempt to circumvent the findings of this court and the appellate process.

[¶ 18] The Town appealed from the summary judgment decision holding the ordinance preempted by state statute and from the injunction against enforcement of the moratorium. Smith cross-appealed

from the court's refusal to grant injunctive relief, its decision that the issue of whether the application was pending was moot, and the court's ruling that Smith had not shown a particularized injury as a predicate to challenging the Town's expenditure of $10,000.

## II. DISCUSSION

### A. Standard of Review

[¶ 19] "We review a trial court's grant of a summary judgment for errors of law and independently examine the parties' statements of material facts to determine if a genuine issue of material fact exists." *White v. McTeague, Higbee, Case, Cohen, Whitney & Toker, P.A.*, 2002 ME 160, ¶ 6, 809 A.2d 622, 623.

### B. Statutory Background

[¶ 20] The Legislature has adopted a comprehensive set of laws governing the disposal of garbage, sludge, septage and other waste. Maine Hazardous Waste, Septage and Solid Waste Management Act, 38 M.R.S.A. §§ 1301–1319–Y (2001 & Supp.2002). In its Declaration of Policy, the Legislature found "municipal waste recycling and disposal facilities have not been developed in a timely and environmentally sound manner because of diffused responsibility for municipal waste planning, processing and disposal among numerous and overlapping units of local government." *Id.* § 1302. In addition, the Legislature decreed, "the provisions of this chapter shall be construed liberally to address the findings and accomplish the policies in this section." *Id.*

[¶ 21] The Act defines "disposal," "septage," "sludge," "solid waste," and "waste facility separately."[2] *Id.* § 1303–C(12),

---

2. The following statutory definitions apply:

12. Disposal. "Disposal" means the discharge, deposit, dumping, spilling, leaking

(27), (28–A), (29), (40). Section 1304 authorizes the DEP to "adopt, amend, and enforce" rules governing the "location, establishment, construction, and alteration of waste facilities as the facility affects the public health and welfare or the natural resources of the State." *Id.* § 1304.

### C. Preemption

[¶ 22] At the center of this dispute lies section 1305(6), detailing municipal powers and duties in regulating and providing for the disposal of septage. Section 1305(6) requires that municipalities provide for the disposal of all septic tank and cesspool septage located within the municipality, and provides:

> or placing of hazardous, biomedical or solid waste, waste oil, refuse-derived fuel, sludge or septage into or on land, air or water and the incineration of solid waste, refuse-derived fuel, sludge or septage so that the hazardous, biomedical or solid waste, waste oil, refuse-derived fuel, sludge or septage or a constituent of the hazardous, biomedical, or solid waste, waste oil, refuse-derived fuel, sludge or septage may enter the environment or be emitted into the air, or discharged into waters, including ground waters.
>
> 27. Septage. "Septage" means waste, refuse, effluent, sludge and any other materials from septic tanks, cesspools or any other similar facilities.
>
> 28–A. Sludge. "Sludge" means nonhazardous solid, semisolid or liquid waste generated from a municipal, commercial or industrial wastewater treatment plant, water supply treatment plant or wet process air pollution control facility or any other waste having similar characteristics and effect. The term does not include industrial discharges that are point sources subject to permits under the federal Clean Water Act, 33 United States Code, Section 1342 (1999).
>
> 29. Solid waste. "Solid waste" means useless, unwanted or discarded solid material with insufficient liquid content to be free-flowing, including, but not limited to, rubbish, garbage, refuse-derived fuel, scrap materials, junk, refuse, inert fill material

[e]ach municipality shall provide for the disposal of all refuse, effluent, sludge and any other materials from all septic tanks and cesspools located within the municipality. In addition, any person may provide a site for disposal of septage. In addition to making application to the Department of Environmental Protection for approval of any site, that person shall have written approval for the site location from the municipality in which it is located, unless the site is located in a Resource Protection District under the jurisdiction of the Maine Land Use Regulation Commission. A municipality may determine whether approval of the site must be obtained first from the department or the municipality. The municipal officers shall approve, af-

> and landscape refuse, but does not include hazardous waste, biomedical waste, septage or agricultural wastes. The fact that a solid waste or constituent of the waste may have value or other use or may be sold or exchanged does not exclude it from this definition.
>
> 40. Waste facility. "Waste facility" means any land area, structure, location, equipment or combination of them, including dumps, used for handling hazardous, biomedical or solid waste, waste oil, sludge or septage. A land area or structure does not become a waste facility solely because:
>
> A. It is used by its owner for disposing of septage from the owner's residence;
>
> B. It is used to store for 90 days or less hazardous wastes generated on the same premises;
>
> C. It is used by individual homeowners or lessees to open burn leaves, brush, deadwood and tree cuttings accrued from normal maintenance of their residential property, when such burning is permitted under section 599, subsection 3; or
>
> D. It is used by its residential owner to burn highly combustible domestic, household trash such as paper, cardboard cartons or wood boxes, when such burning is permitted under section 599, subsection 3.
>
> 38 M.R.S.A. § 1303–C(12), (27), (28–A), (29), (40) (2001 & Supp.2002).

ter hearing, any such private site if they find that the site complies with municipal ordinances and with local zoning and land use controls. In the absence of applicable municipal ordinances and local zoning and land use controls, the municipality shall base its approval of the site on compliance with the siting and design standards in the department's rules relating to septage management. For purposes of this subsection, "municipality" means a city, town or plantation.

*Id.* § 1305(6).

[¶ 23] In addition, the Act provides that municipalities are "prohibited from enacting stricter standards than those contained in this chapter" and in relevant portions of DEP's rules for solid waste disposal facilities, but the Act is silent about other waste facilities. *Id.* § 1310–U.[3] Municipalities may enact other ordinances regulating solid waste facilities, pursuant to 30–A M.R.S.A. § 3001 (1996) (Maine's Home Rule statute), "provided that the standards are not more strict than those contained in this chapter and in chapter 3, subchapter I, article 5–A and 6 and the rules adopted under these articles." 38 M.R.S.A. § 1310–U.

[¶ 24] Just as federal laws may preempt state laws either expressly or by implication, *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992), state statutes may preempt local ordinances either expressly or implicitly, *see* 30–A M.R.S.A. § 3001. Maine's statute extending "home rule," as provided by the Maine Constitution, indicates that a municipality may adopt any ordinance or "exercise any power or function" which is "not denied expressly or by clear implication." 30–A M.R.S.A. § 3001.[4] It includes the following standard for determining when an ordinance may be preempted by implication: "[t]he Legislature shall not be held to have implicitly denied any power granted to municipalities under this section unless the municipal ordinance in question would frustrate the purpose of any state law." *Id.* § 3001(3). The determinative factor is, therefore, whether the ordinance "would frustrate the purpose of any state law." *School Comm. of Town of York v. Town of York*, 626 A.2d 935, 939 (Me.1993) (discussing 30–A M.R.S.A. § 3001(3)). We will view municipal action as preempted only when the application of the "municipal ordinance prevents the efficient accomplishment of a defined state purpose." *Id.* at 938 n. 8.

---

3. Section 1310–U deals with solid waste, not septage.

4. The Home Rule statute reads as follows:
 3001. Ordinance power
 Any municipality, by the adoption, amendment or repeal of ordinances or bylaws, may exercise any power or function which the Legislature has power to confer upon it, which is not denied either expressly or by clear implication, and exercise any power or function granted to the municipality by the Constitution of Maine, general law or charter.
 1. Liberal construction. This section, being necessary for the welfare of the municipalities and their inhabitants, shall be liberally construed to affect its purposes.

2. Presumption of authority. There is a rebuttable presumption that any ordinance enacted under this section is a valid exercise of a municipality's home rule authority.
3. Standard of preemption. The Legislature shall not be held to have implicitly denied any power granted to municipalities under this section unless the municipal ordinance in question would frustrate the purpose of any state law.
4. Penalties accrue to municipality. All penalties established by ordinance shall be recovered on complaint to the use of the municipality.
30–A M.R.S.A. § 3001.

[¶ 25] On two occasions, we have held that state statutes preempt ordinances banning or strictly regulating the siting or operation of solid waste disposal facilities.[5] *Sawyer Envtl. Recovery Facilities, Inc. v. Town of Hampden*, 2000 ME 179, ¶¶ 31–33, 760 A.2d 257, 265–266; *Midcoast Disposal, Inc. v. Town of Union*, 537 A.2d 1149, 1151 (Me.1988). In *Midcoast Disposal*, we found a Town's total ban on waste facilities was contrary to "a clear legislative intention to remove any authority a municipality may have had to prohibit the establishment and operation of a private facility within its borders for the disposal of out-of-town solid waste." *Midcoast Disposal*, 537 A.2d at 1151. We specifically interpreted the Board of Environmental Protection's (DEP's antecedent agency) statutory authority to license public or private waste facilities as preempting a municipal ordinance barring the location of any such facility in the Town. *Id.* (interpreting 38 M.R.S.A. § 1304(8)(A) (repealed 1987)).

[¶ 26] More recently, we concluded that the Act preempted a Town's ordinance prohibiting the expansion of a landfill as a non-conforming use. *Sawyer Envtl.*, 2000 ME 179, ¶¶ 24–34, 760 A.2d at 263–66. Consistent with our holding in *Midcoast*, the Town's ordinance in *Sawyer* exceeded the class of local regulations permitted by the applicable statute and the limited municipal role accorded the Town. *Id.* (interpreting 38 M.R.S.A. §§ 1310–S, 1310–U). The zoning ordinance, as applied, absolutely banned the location and expansion of landfills within the Town, and, therefore, was "preempted by the State solid waste management laws establishing a comprehensive regulatory scheme under which the State, through the DEP, regulates the location and expansion of landfills." *Id.* ¶ 33.

[¶ 27] In contrast, however, a Town ordinance "imposing future limitations on sewer usage" does not violate the Home Rule statute. *Tisei v. Town of Ogunquit*, 491 A.2d 564, 570 (Me.1985). In *Tisei*, we interpreted the charter of the Ogunquit Sewer District, not the Act, and found it did not preclude the Town's adoption of a restrictive ordinance. *Id.*

[¶ 28] Addressing the septage provisions of the Act, we held that, in the absence of a local septage ordinance, Town officials could not expand upon the siting and design requirements provided in section 1305(6) and related DEP rules. *Hutchinson v. Cary Plantation*, 2000 ME 129, ¶ 13, 755 A.2d 494, 497. In *Hutchinson*, the Assessors of Cary Plantation were limited to Department rules and could not consider additional factors when assessing the applicant's renewal permit. *Id.* Specifically, a footnote in *Hutchinson* anticipated the preemption issue presented in this case by noting, "Cary Plantation does not challenge the Legislature's authority to designate specific areas of review by the municipality." *Id.* ¶ 11 n. 4.

[¶ 29] In light of these authorities, the Superior Court erred in holding the Town of Pittston's ordinance invalid for several reasons. First, unlike section 1310–U, section 1305(6) clearly contemplates the DEP and Town's joint participation in licensing the spread of septage. Section 1305(6) obligates the Town of Pittston to "provide for the disposal of all refuse, effluent, sludge and any other materials from small septic tanks and cess-

---

5. In another context, we have held that a Town ordinance restricting the granting of liquor licenses worked at "cross purposes" with the extensive statutory scheme regulating alcohol found in 28 M.R.S.A. § 252–A(1) (repealed 1987). *Ullis v. Town of Boothbay Harbor*, 459 A.2d 153, 159–160 (Me.1983).

pools located within the municipality." The record reflects that the Town of Pittston has provided for the disposal of septage by virtue of its contract with Interstate Septic Systems and that DEP has certified that the Town's contract satisfies the requirements of section 1305(6). Thus, application of the ordinance is consistent with the defined state purpose to provide for safe and effective waste management. *See* 38 M.R.S.A. § 1302. Second, in section 1310–U, our Legislature clearly demonstrated that it is aware of its authority to preempt municipal participation in waste management matters. The Legislature chose not to include septage as one such matter under section 1305(6) and, instead, made the Town a party to the septage licensing process.

[¶ 30] Finally, the second sentence of section 1305(6) states, "[i]n addition, any person may provide a site for the disposal of septage," and further explains how such a site must be approved by both the DEP and the municipality. The Legislature approached the problem of septage disposal from two directions: making municipalities responsible for septage disposal, while at the same time allowing private persons to provide disposal sites, subject to state and local regulation. The latter provision not only allows a continued role for businesses utilizing and profiting from septage disposal, *see* L.D. 209, Statement of Fact (107th Legis.1975) ("Traditionally, private enter-

prise has provided sites for the disposal of septic tank and cesspool material."), but also helps to assure an adequate and affordable supply of appropriate disposal sites, *cf.* 38 M.R.S.A. § 1302 (stating that one reason for waste management statutes is "that environmentally suitable sites for waste disposal are in limited supply and represent a critical natural resource").

[¶ 31] If the Town's ordinance prohibited all methods of septage disposal, Smith would have a stronger argument that the purposes of section 1305(6) are frustrated. However, the ordinance prohibits septage spreading, also known as land application, which is only one method of septage disposal.[6] The DEP's regulations permit land application of septage, and Smith received a land application license under the Septage Management Rules. 06–096 CODE ME. R. ch. 420, §§ 4–10 (2003). Other portions of the DEP regulations, however, permit different disposal methods, including the composting of dewatered septage, *id.* ch. 409, § 1(A)(3) (2003), and the addition of septage to wastewater treatment facilities, *id.* ch. 555.[7] The Town of Pittston's ban on land application may have the effect of making septage disposal within the Town more difficult and expensive, but it does not frustrate the purposes of section 1305(6) because the ordinance still permits septage disposal within the Town by other methods. Ac-

6. The ordinance also prohibits the storage and dumping of septage. Storage is not covered by section 1305(6) because it does not constitute "disposal." *See* 38 M.R.S.A. § 1303–C(12). Dumping is not at issue here because, to the extent that dumping means something different than spreading, Smith did not propose to dump septage.

7. The section of the DEP Septage Management Rules applicable to municipalities also notes the variety of available septage disposal methods, mandating that each municipality receive a license ensuring its compliance with

the first sentence of 38 M.R.S.A. § 1305(6), but exempting "[a]ny municipality which complies with this requirement by obtaining a license for its own septage land application site, septage processing [including composting] facility, or wastewater treatment facility." 06–096 CODE ME. R. ch. 420, § 17 (2003). The record shows that Pittston did not operate its own disposal facility, but obtained a DEP license to dispose of all septage from the Town at a licensed composting facility in Rockland.

cordingly, the Superior Court erred in holding that the ordinance was invalid.

### D. Viability

■ [¶ 32] Smith requested the Superior Court to declare that the third septage ordinance could not be applied to his application because it was pending and, therefore, viable at the time the ordinance was enacted. Title 1, section 302 prohibits the application of statutes and ordinances to pending applications for administrative actions. *See* 1 M.R.S.A. § 302 (1989).[8] For the purposes of section 302, we have determined that an application is "pending" when a "municipality takes the threshold step of acting on the substance of a proposal." *Littlefield v. Inhabitants of the Town of Lyman*, 447 A.2d 1231, 1235 (Me. 1982). The provisions of section 302, however, are inapplicable by the express terms of Ordinance III.

[¶ 33] Ordinance III, adopted on October 19, 2000, states that its prohibition on septage spreading "shall apply, notwithstanding the provisions of 1 M.R.S.A. § 302, to all proceedings, application[s], and petitions except those which were pending prior to June 23, 1999." We held in *City of*

*Portland v. Fisherman's Wharf Assocs. II*, 541 A.2d 160 (Me.1988), that because section 302 is a rule of statutory construction, an express provision of retroactivity within a municipal ordinance removes the ordinance from its application. *Id.* at 164 ("[I]f either a statute or an ordinance contains a provision of retroactivity, section 302's rule of prospectivity is negated."). Any factual dispute as to whether a substantive review occurred after June 23, 1999, is, therefore, immaterial.

[¶ 34] The pertinent factual issue is whether Smith's application had received a substantive review before June 23, 1999, and on this point there is no dispute. Smith did not file an application with the municipal officers until November 24, 1999, over five months after the effective date of the ordinance. Smith's application was not pending and is subject to the provisions of Ordinance III.

### E. Expenditure of Town Funds

■ [¶ 35] In Counts VI, VII, and VIII, Smith challenged the Town's appropriation and expenditure of funds to reimburse citizens for expenditures related to the first septage ordinance, claiming that this ap-

---

8. Section 302 reads:

302. Construction and effect of repealing and amending Acts

The repeal of an Act, resolve or municipal ordinance passed after the 4th day of March, 1870 does not revive any statute or ordinance in force before the Act, resolve or ordinance took effect. The repeal or amendment of an Act or ordinance does not affect any punishment, penalty or forfeiture incurred before the repeal or amendment takes effect, or any action or proceeding pending at the time of the repeal or amendment, for an offense committed or for recovery of a penalty or forfeiture incurred under the Act or ordinance repealed or amended. Actions and proceedings pending at the time of the passage, amendment or repeal of an Act or ordinance are not affected thereby. For the purposes of this section, a proceeding shall include but not be limited to petitions or applications for licenses or permits required by law at the time of their filing. For the purposes of this section and regardless of any other action taken by the reviewing authority, an application for a license or permit required by law at the time of its filing shall be considered to be a pending proceeding when the reviewing authority has conducted at least one substantive review of the application and not before. For the purposes of this section, a substantive review of an application for a license or permit required by law at the time of application shall consist of a review of that application to determine whether it complies with the review criteria and other applicable requirements of law.

propriation was illegal because it was not for a public purpose.[9]

[¶ 36] Smith's Rule 56(h) statement of material facts was defective, as the trial court found, because he did not "properly controvert defendant's statements [of material facts] by either admitting, denying or qualifying ... [and] fail[ed] ... to give proper record references." According to the Town's statement of material facts, the money at issue was appropriated "for the purpose of hiring experts to defend the first septage spreading ordinance and to pay legal fees and mailing expenses which were incurred in bringing the ordinance to a vote at the December 22, 1999, special Town meeting," and monies were disbursed from the appropriation "in order to pay all costs incurred by citizens relating to the first septage spreading ordinance." On those facts, which Smith did not properly dispute, the expenditure was for a public purpose and was not illegal. *Cf. Delogu v. State*, 1998 ME 246, ¶ 10, 720 A.2d 1153, 1155 (stating that we interpret article IV, part 3, section 1 of the Maine Constitution "to require that taxation and spending at either the state or local level be for a public purpose to be constitutionally valid"). The Town was thus entitled to a summary judgment on Counts VI, VII, and VIII.

F. Injunction

 [¶ 37] The Town argues that the court erred in enjoining the Town from enforcing a proposed moratorium. Smith argues that the court erred in not enjoining the Town to "give [Smith's] application ...substantive review prior to the scheduled vote on the new moratorium."

[¶ 38] Smith's request that the court order the municipal officers to consider his septage-spreading application the same day the court entered its order and before the moratorium vote became moot when, on February 21, 2002, that vote occurred. The propriety of the injunction against enforcement of the moratorium is also moot because if the moratorium was adopted—a fact that does not appear in the record—then it expired by its own terms on August 20, 2002. Moreover, our determination that Ordinance III is valid makes any issue with respect to the moratorium moot because the moratorium merely duplicated the ordinance's ban on the spreading, storage, or dumping of septage.

The entry is:

Judgment for Jerald Smith on Count IX of his complaint vacated. Remanded for entry of judgment in favor of Town of Pittston on that count. Judgment for the Town of Pittston on the remaining counts of Smith's complaint affirmed. Appeal and cross-appeal from the order on post-judgment injunction dismissed as moot.

DANA, J., with whom SAUFLEY, C.J. and LEVY, J., join, dissenting.

[¶ 39] Because the Pittston ordinance illegally frustrates the Legislature's intent to encourage the development of affordable, environmentally suitable waste disposal sites by effectively preventing the private disposal of septage within the Town, I respectfully dissent from that portion of the Court's opinion that concludes otherwise.

[¶ 40] The Court explains that pursuant to 38 M.R.S.A. § 1305(6) (2001) Pittston has two responsibilities. First, it must

---

9. In Count VI, Smith sought a declaration that the appropriation was void. In Count VII, Smith sought an injunction enjoining the Town from disbursing $10,000 for non-public purposes, and in Count VIII, Smith sought an order requiring the Town to seek return of a portion of the $10,000 disbursed for non-public purposes.

provide for the disposal of all septage within the municipality, and second, it must permit "any person to provide a site for septage disposal." *Id.* According to 30–A M.R.S.A. § 3001 (1996), to the extent that the Pittston ordinance frustrates the purpose of either of these requirements, the ordinance is ultra vires. *See Hallissey v. School Admin. Dist. No. 77,* 2000 ME 143, ¶ 11, 755 A.2d 1068, 1072 (public bodies, as the creation of state legislatures, "may exercise only that power which is conferred upon them by law. The source of that authority must be found in the enabling statute either expressly or by necessary inference as an incidence essential to the full exercise of powers specifically granted.") (citation omitted). I agree that Pittston has satisfied its first obligation, but I disagree that Pittston's ordinance does not frustrate the purpose behind the second provision. The Court concludes that Pittston's broad ban on the "spreading, storing or dumping" of septage does not frustrate the Legislature's intent because the ordinance does not prohibit all methods of septage disposal. According to the Court, because any person may construct his or her own wastewater treatment facility or compost dewatered septage, the ordinance does not frustrate the purpose of the statute. I disagree.

[¶ 41] To be charitable, the Court's suggestion that Smith could build a private wastewater treatment facility is, at least, impractical. First, the DEP has not established rules specifically for the licensing of private wastewater treatment plants. Therefore, the requirements for such an endeavor are unclear. Second, assuming the rules for public plant licensing apply to private plant licensing, this is an extremely expensive septage disposal option, not only because of the high initial cost of building a wastewater treatment plant but because the daily volume of septage Smith could receive at such a facility could not exceed 1% of the average daily design flow for that facility. *See* 06–096 CODE ME. R. ch. 555–3 § 9(A) (2003). The idea of building a wastewater treatment facility for the primary purpose of septage disposal is impractical because, notwithstanding the huge front-end cost of construction, the owner would have to find some way of substantially diluting the septage so that it could be treated. The DEP's recognition that "the addition of septage [to wastewater treatment facilities] stresses sludge handling capacity causing high operation and maintenance costs," 06–096 CODE ME. R. ch. 555–4 (2003), Basis Statement, supports the conclusion that it is an undesirable disposal alternative.

[¶ 42] The second method the Court suggests, the composting of dewatered septage, is impractical and may also run afoul of the ordinance. The dewatering and composting of septage is so rarely employed that the DEP has only provided us with a definition.[10] The DEP has not established any rules for the disposal of the effluent from the "dewatering" process. If Smith wanted to undertake such a process it is unclear how he would go about it. The absence of any rules suggests that this disposal method is rarely, if ever, employed. Furthermore, it is difficult to envision a process for dewatering and composting septage that would not conflict with Pittston's ban on the "spreading, storing or dumping" of septage. Finally, assuming for purposes of this discussion that Pittston would regard dewatered septage

10. " 'Dewatered Septage' means the solid fraction removed from septage, by mechanical means such as a sand filter, clarifier or belt filer press." 06–096 CODE ME. R. ch. 400 § 1(PP) (2003).

as something other than septage,[11] Smith would still have to contend with the disposal of the liquid effluent.

[¶ 43] The Legislature spoke clearly when it declared the policy behind the waste management statute. Recognizing that "environmentally suitable sites for waste disposal are in limited supply and represent a critical natural resource" and that "municipal waste recycling and disposal facilities have not been developed in a timely and environmentally sound manner because of diffused responsibility for municipal waste planning, processing and disposal among numerous and overlapping units of local government," 38 M.R.S.A. § 1302 (2001), the Legislature provided that "any person may provide a site for disposal of septage," *id.* § 1305(6). While the Legislature clearly intended municipalities to have a meaningful role in regulating those facilities,[12] it did not intend to allow municipalities to ban all practical septage disposal options. The Court substantially understates the impact of the Pittston ordinance when it concludes that it makes private septage disposal "more difficult and expensive." Pittston has thwarted the Legislature's intent to foster the creation of adequate, affordable, environmentally suitable, private septage disposal sites. Its ordinance is, therefore,

ultra vires. Thus, I would affirm the Superior Court's judgment in this respect.

---

11. The fact that the DEP categorizes the rules for composting dewatered septage as solid waste management rules, 06–096 CODE ME. R. ch. 409(1)(A)(3) (2003), and the definition of "solid waste" specifically excludes septage, 38 M.R.S.A. § 1303–C(29) (Supp.2002), suggests the DEP regards dewatered septage as something other than septage.

12. Section 1305(6) permits municipalities to enact ordinances regulating the conditions of septage disposal sites, but also provides that "municipal officers *shall approve*, after hearing, *any private site* if they find that it complies with municipal ordinances and with local zoning and land use controls." 38 M.R.S.A. § 1305(6) (emphasis added). In the

absence of municipal regulations, state "siting and design standards" apply. This language demonstrates the Legislature's intent that municipalities would have a limited role, limited to the development of "siting and design standards," because municipal approval is mandated once those standards are met. The statute's provision concerning "coordination between municipality and department," which allows a municipality to suggest conditions to be imposed on a proposal for sludge land application that the Department of Environmental Protection may then reject, further supports this interpretation. *See id.* § 1305(9)(A).