# United States Court of Appeals
## For the First Circuit

No. 18-2118

PORTLAND PIPE LINE CORPORATION;
THE AMERICAN WATERWAYS OPERATORS,

Plaintiffs, Appellants,

v.

CITY OF SOUTH PORTLAND;
MATTHEW LECONTE, in his official capacity as Code Enforcement
Director of South Portland,

Defendants, Appellees.

———————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, Jr., U.S. District Judge]

———————

Before

Torruella, Thompson, and Barron,
Circuit Judges.

———————

Catherine R. Connors, with whom John J. Aromando, Matthew D. Manahan, Nolan L. Reichl, and Pierce Atwood LLP were on brief, for appellants.

Jonathan M. Ettinger, with whom Euripides Dalmanieras, Jesse H. Alderman, Foley Hoag LLP, Sally J. Daggett, and Jensen Baird Gardner & Henry were on brief, for appellees.

David H. Coburn, Joshua H. Runyan, and Steptoe & Johnson LLP were on brief, for American Fuel & Petrochemical Manufacturers, American Petroleum Institute, Association of Oil Pipe Lines, International Liquid Terminals Association, National Association of Manufacturers, and National Mining Association, amici curiae.

Twain Braden and Thompson Bowie & Hatch, LLC were on brief,

for Portland Pilots, Inc., Maine Energy Marketers Association, and Associated General Contractors of Maine, amici curiae.

Samuel D. Adkisson, Patrick Strawbridge, Consovoy McCarthy Park PLLC, Steven P. Lehotsky, Michael B. Schon, and U.S. Chamber Litigation Center were on brief, for U.S. Chamber of Commerce, amicus curiae.

Maura Healey, Attorney General for the Commonwealth of Massachusetts, Seth Schofield, Senior Appellate Counsel, Turner Smith, Assistant Attorney General, and Office of the Attorney General of Massachusetts were on brief, for Massachusetts, California, Connecticut, Delaware, Maine, Maryland, Minnesota, New York, Oregon, Pennsylvania, Rhode Island, Vermont, Washington, and the District of Columbia, amici curiae.

Sarah J. Fox, Northern Illinois University College of Law, Lisa C. Goodheart, William L. Boesch, C. Dylan Sanders, and Sugarman Rogers Barshak & Cohen, P.C. were on brief, for International Municipal Lawyers Association and Legal Scholars, amicus curiae.

Sean Mahoney, Conservation Law Foundation, Jan E. Hasselman, Earth Justice, Kenneth J. Rumelt, and Vermont Law School were on brief, for Conservation Law Foundation, Natural Resources Council of Maine, and Protect South Portland, amici curiae.

---

January 10, 2020

---

**Per Curiam**.  This case involves a clash between Portland Pipe Line Corporation ("PPLC"), a Maine corporation engaged in the international transportation of oil, and the City of South Portland (the "City"), which enacted a municipal zoning ordinance prohibiting the bulk loading of crude oil onto vessels in the City's harbor.  The practical effect of the ordinance at issue, known as the Clear Skies Ordinance (the "Ordinance"), is to prevent PPLC from using its infrastructure to transport oil from Montréal, Québec, Canada to South Portland, Maine via a system of underground pipelines.  On appeal, PPLC and the American Waterways Operators, a national trade organization whose industry members employ thousands of seamen (and women) who would be negatively impacted by the loss of port traffic associated with PPLC's pipeline system, argue, in part, that the Ordinance is preempted by Maine's Coastal Conveyance Act ("CCA") and runs afoul of federal constitutional law.

In accordance with well-settled constitutional avoidance doctrine, see Vaquería Tres Monjitas, Inc. v. Pagan, 748 F.3d 21, 26 (1st Cir. 2014), we sidestep the federal quagmire for the moment.  This dispute raises important questions of state law preemption doctrine and statutory interpretation that (in our view) are unresolved and may prove dispositive.  We therefore certify three questions to the Maine Law Court.  See Fortin v. Titcomb, 671 F.3d 63, 64 (1st Cir. 2012) (certifying questions to

- 3 -

the Law Court where there were "no clear controlling [state law] precedents" (quoting Me. Rev. Stat. tit. 4, § 57)).  Some context for those questions, along with the questions themselves, follow.

## I. Background

We begin by reciting the undisputed facts and procedural background germane to the issues of state law presented herein. PPLC and its parent company, Montreal Pipe Line Limited, operate the Portland-Montreal Pipe Line, a mostly underground pipeline system that primarily transports oil from South Portland, Maine, through three states, across the Canadian border, to the system's northern terminus in Montréal, Québec.  In connection with this work, PPLC has for years obtained the state and federal regulatory approvals necessary to unload crude oil from tanker vessels in the City's harbor to be held in above-ground storage facilities pending transport to Canada via the pipeline system.

Beginning in or around 2007, to accommodate purported changes in demand, PPLC made efforts to reverse the flow of oil along the pipeline system such that oil would flow southbound from Montréal to South Portland, where it would then be loaded onto tankers in the City's harbor for distribution in the United States. Over the next few years, PPLC requested and received permission to proceed with the reversal project from federal, state, and municipal agencies.  On July 18, 2008, for example, the U.S. Department of State approved the reversal project after concluding

it did not represent a substantial deviation from the work previously approved by the federal government pursuant to a Presidential Permit issued to PPLC in 1999.[1] Less than a year later, on August 25, 2009, PPLC obtained an air emissions license from Maine's Department of Environmental Protection ("MDEP"), the agency charged with enforcing the state's environmental laws. Additionally, as is relevant to the certification questions presented here, on December 20, 2010, MDEP renewed PPLC's existing oil terminal facility license under the authority granted to MDEP by the CCA.[2] The license application summary, criteria for renewal, findings of fact, and formal approval of the renewal license are memorialized in an MDEP document titled "Department Order," which acknowledges and approves PPLC's plans to "reverse one of its underground pipe lines" and "store[] [oil] in . . . above ground tanks prior to being loaded onto vessels at the South Portland pier for transport to refineries and terminals outside the state of Maine."[3] At the local level, PPLC sought and received

---

[1] The State Department followed up with PPLC on August 13, 2013, instructing PPLC to provide more information about the changes in advance of implementing the flow reversal.

[2] As explained in more detail later, the CCA imbues MDEP with authority to issue licenses to oil terminal facilities and to adopt rules and regulations concerning their operations. See Me. Rev. Stat. tit. 38, §§ 544, 546.

[3] MDEP renewed PPLC's license pursuant to a second document titled "Department Order," dated September 11, 2015.

zoning approval from the City's Planning Board.  Despite receiving these and other necessary regulatory approvals, PPLC halted its plans prior to implementation, choosing instead to wait out the economic decline precipitated by the Great Recession.

As economic conditions improved in 2012 and 2013, PPLC revived the pipeline reversal project.  Around the same time, however, environmental interest groups began lobbying for a municipal referendum that would (among other things) bar a key component of the project:  the transportation of Canadian oil sands (or, as environmentalists call it, "tar sands") via pipeline to South Portland, where PPLC planned to load the same onto vessels in the City's harbor.  City residents voted against this citizen-initiated referendum on November 5, 2013.  But South Portland's City Council subsequently created a draft ordinance committee to consider changes to City code that, according to the City, would "protect the public health and welfare from adverse or incompatible land uses, or adverse impacts to local air, water, aesthetic, recreational, natural, or marine resources" caused by the loading of unrefined petroleum products, like Canadian oil sands, onto marine tank vessels docking in South Portland's harbor.  After a months-long drafting and review process conducted by the draft ordinance committee, the City Council passed Ordinance No. 1-14/15, the Clear Skies Ordinance, on July 21, 2014.  The Ordinance prohibits the "bulk loading of crude oil onto any marine tank

vessel," South Portland, ME, Ordinance #1-14/15, nipping PPLC's reversal project in the bud.

According to PPLC (and as disputed by the City), if it cannot move forward with the reversal project, it likely cannot survive as a business.[4] As PPLC tells it, one of the system's two pipelines has been completely idle as a result of insufficient demand for northbound shipping and the Ordinance's impediment to southbound shipping. The other pipeline, while still active, transports what amounts to a "trickle" of oil.

Deprived of the means and method by which it intended to transport oil from Canada into the United States as part of the reversal project, PPLC filed suit against the City and the City's code enforcer in U.S. District Court for the District of Maine on February 6, 2015. Count IX of PPLC's nine-count complaint alleges the Ordinance is preempted by the CCA and, in particular, a provision of the statute that prohibits municipal activity which directly conflicts with a MDEP rule or order, including (as PPLC views it) the 2010 MDEP renewal license authorizing PPLC's reversal project in a document titled "Department Order." The complaint's

---

[4] PPLC contends that the flow reversal project is a necessary response to the recent increase in the production of Canadian oil sands, which has reduced demand for northward flow on PPLC's pipelines.

remaining claims primarily concern the Ordinance's alleged violation of various federal laws and federal preemption doctrine.[5]

The City filed a motion to dismiss, which was denied on February 11, 2016. The parties subsequently filed cross-motions for summary judgment, which culminated with the district court dismissing all but one of PPLC's claims on December 29, 2017. In dispensing with PPLC's state law preemption claim, in particular, the district court concluded the 2010 MDEP renewal license document titled "Department Order" is not an "order" with preemptive effect under the CCA and, even if it is, the Ordinance does not directly conflict with the CCA to the extent the statute leaves room for local zoning restrictions like the Ordinance. PPLC's remaining

---

[5] PPLC's federal claims are as follows: (Count I: Preemption - Pipeline Safety Act, 49 U.S.C. §§ 60101 et seq.); (Count II: Preemption - Foreign Affairs Doctrine, U.S. Const., art. 2, §§ 2, 3); (Count III: Preemption – The Ports and Waterways Safety Act, 33 U.S.C. §§ 1225(a)(1), 1225(a)(2)(A)); (Count IV: Preemption - Maritime Law, U.S. Const., art. 3, § 2); (Count V: Commerce Clause Violation, U.S. Const., art. 1, § 18); (Count VI: Due Process and Equal Protection Clause Violations, U.S. Const., amend. XIV, § 1); and (Count VII: Civil Rights Act Violation, 42 U.S.C. § 1983).

We should also note the complaint alleges as Count VIII that the Ordinance is inconsistent with the City's Comprehensive Plan enacted and amended under the authority granted municipalities pursuant to Me. Rev. Stat. tit. 30-A, § 4352. Because PPLC does not press this claim in earnest on appeal, we do not seek analysis of the same from the Law Court.

claim after summary judgment was dismissed on August 27, 2018, following a four-day bench trial.[6]

PPLC timely appealed to this Court on November 7, 2018. The Court heard oral argument on July 23, 2019. We then invited the parties and the State of Maine, which (along with other amici) had filed an amicus brief on behalf of the City, to file supplemental briefs on the following questions that (if answered in the affirmative) would resolve the state law preemption claim and this matter as a whole: (1) whether the 2010 MDEP renewal license is an order with preemptive effect under the CCA; and (2), if the renewal license is an order, whether the Ordinance directly conflicts with the same. Even after careful review of the parties' proffers, we believe the case lacks controlling precedent and presents "close and difficult legal issue[s]" that warrant certification to the Law Court. In re Engage, Inc., 544 F.3d 50, 53 (1st Cir. 2008). We have recognized that certification may be an appropriate option even where, as here, the parties have not requested it. See Me. Drilling & Blasting, Inc. v. Ins. Co. of N. Am., 34 F.3d 1, 3 (1st Cir. 1994) (noting that the Court on occasion certifies "questions to a state's highest court upon our own motion").

---

[6] On October 10, 2018, the district court entered an amended judgment clarifying that Count VII of the complaint was dismissed without prejudice.

## II. The Issues

With the relevant facts and procedural background covered, we turn to the state law questions for which we seek certification. We begin our discussion with a review of the relevant provisions of the CCA.

### A. The Coastal Conveyance Act

In enacting the CCA, the Maine legislature declared that the "highest and best" uses of the state's seacoast include public and private recreation, fishing, lobstering, and "gathering other marine life used and useful in food production and other commercial activities." Me. Rev. Stat. tit. 38, § 541. To preserve the integrity of Maine's coastline for such uses, state lawmakers, through the enactment of the CCA, conferred upon MDEP "the power to deal with the hazards and threats of danger and damage" posed by transfers of oil, petroleum products, and their by-products between vessels and onshore oil facilities in state waters. Id. The CCA imposes a licensure requirement on anyone who wishes to perform oil transfers in or around state waters, see id. § 545 (prohibiting the "operat[ion]" of any "oil terminal facility . . . without a license"), and vests MDEP with the authority to issue such licenses, id. § 544(2). The CCA also grants MDEP the "power to adopt rules and regulations" for "[o]perating and inspection requirements for facilities, vessels, personnel and other matters relating to licensee operations." Id.

§ 546(4). MDEP, in turn, has developed regulations governing marine oil terminals and oil transfers.

Although the CCA acknowledges the potential for municipal activity within the sphere of the CCA's (and, by extension, MDEP's) authority, it includes the following limitation in the case of conflict between the two:

> Nothing in this subchapter may be construed to deny any municipality, by ordinance or by law, from exercising police powers under any general or special Act; provided that ordinances and bylaws in furtherance of the intent of this subchapter and promoting the general welfare, public health and public safety are valid unless in direct conflict with this subchapter or any <u>rule or order</u> of the board or commissioner adopted under authority of this subchapter.

Id. § 556 (emphasis added).

With this regulatory framework in mind, we turn to the state law questions, covering whether MDEP's December 2010 renewal license constitutes an "order" with preemptive effect and then discussing whether the Ordinance is preempted by the text of § 556 and whether, independent of any express preemption powers set forth in § 556, preemption may be otherwise implied by the CCA.

**1. Whether the MDEP License Is an Order.**

PPLC's license renewal application sought authorization to reverse the flow of one of PPLC's underground pipelines and to store oil in above-ground tanks prior to being loaded onto vessels in the City's harbor. After concluding that PPLC's operations satisfied statutory and regulatory criteria, MDEP's Acting

Commissioner approved the application and issued PPLC a license in a document titled "Department Order."  Notwithstanding MDEP's review and approval of PPLC's reversal operations, the City enacted the Ordinance, which serves as a blanket prohibition on all unrefined oil-loading activity in the harbor.

PPLC has argued that MDEP licenses issued pursuant to the CCA are considered orders with preemptive effect.  According to PPLC, to decide otherwise would render meaningless certain MDEP enforcement powers outlined in the CCA.  PPLC argues, for example, that distinguishing orders from licenses could subject MDEP's licensure decisions to procedural delays that would impede the department's ability to quickly respond to potentially dangerous activity.  See Me. Rev. Stat. tit. 38, § 557 (explaining that MDEP "orders" cannot be stayed pending appeal, which PPLC cites for the proposition that MDEP's licensure decisions would not be entitled to procedural safeguards against delay if the Court determines such licenses are distinct from orders).  The City and the State of Maine, on the other hand, argue that nothing in the text of the MDEP renewal license at issue suggests that it is an order with preemptive effect, and the use of the letterhead "Department Order," without more, does not bestow upon a license the power of preemption.  Neither appeal to plain language wins the day in our view.  The parties' attempts to define the term "order" by cherry-picking relevant provisions of the CCA are similarly unavailing.

We therefore seek clarification from the Law Court. In so doing, we respectfully ask the Law Court to consider, as the district court did, whether interpreting "order" to include MDEP licenses infringes upon "home rule" authority reserved for the state's municipalities. See Portland Pipe Line Corp. v. City of S. Portland, 288 F. Supp. 3d 321, 457 (D. Me. 2017) (explaining that "[t]here is no indication in the [CCA] that the State intended to remove local home rule authority over facility siting and use prohibitions through these [M]DEP licenses"); id. at 458 (observing that "[i]f the licenses had the preemptive effect PPLC claims, there is virtually no room for local regulation in this realm at all, since every single transfer facility must have a license"); see also Me. Rev. Stat. tit. 30-A, § 3001 (implementing home rule authority, which reserves for municipalities power that is "not denied either expressly or by clear implication").

**2. Whether the Ordinance Is Expressly or Impliedly Preempted.**

Next up, we welcome analysis from the Law Court on whether the CCA expressly or by implication preempts the Ordinance. First, assuming the 2010 MDEP renewal license is an "order" under § 556, we seek guidance regarding whether § 556 of the CCA expressly preempts the Ordinance. As mentioned, the parties disagree as to whether the license is an order such that § 556 applies here. The parties also disagree about whether, even if the license is an order, the terms of § 556 are such that the

- 13 -

Ordinance is expressly preempted. In support of their arguments, the parties offer competing interpretations of "in furtherance of the intent of this subchapter" and "direct conflict," as those terms appear in the text of § 556.

Second, even if the text of § 556 does not require express preemption here, the question remains whether the CCA, independent of any express preemption that it effects in consequence of § 556, impliedly preempts the Ordinance. Under Maine law, ordinances are preempted by implication only where "state law is interpreted to create a comprehensive and exclusive regulatory scheme inconsistent with the local action" or where "the municipal ordinance prevents the efficient accomplishment of a defined state purpose." Dubois Livestock, Inc., 103 A.3d at 561 (citations omitted) (first quoting Sawyer Envtl. Recovery Facilities, Inc. v. Town of Hampden, 760 A.2d 257, 264 (Me. 2000) and then quoting E. Perry Iron & Metal Co. v. City of Portland, 941 A.2d 457, 462 (Me. 2008)). According to the City and the State of Maine, the Ordinance is not inconsistent with a "comprehensive and exclusive regulatory scheme," because the CCA -- in § 556 -- expressly contemplates local regulation. The City and the State also argue the Ordinance does not "prevent[] the efficient accomplishment of a defined state purpose," but they diverge as to why. PPLC, by contrast, argues both that the Ordinance intrudes into the CCA's comprehensive and exclusive regulatory scheme and that, because

- 14 -

the Ordinance's blanket prohibition on loading crude oil restricts the transfer of the same, the Ordinance prevents the efficient accomplishment of the CCA.

The district court and the parties rely primarily on the Law Court's implied preemption analysis in Sawyer, 760 A.2d 257 (Me. 2000) and Smith v. Town of Pittston, 820 A.2d 1200 (Me. 2003). In Sawyer, a municipal zoning ordinance prohibited the expansion of a solid waste facility after the expansion was approved by MDEP pursuant to state waste management laws. Sawyer, 760 A.2d at 265–66. Specifically, the ordinance was found to be preempted because its "absolute prohibition of the expansion prevent[ed] the 'efficient accomplishment' of the 'defined state purpose'" of Maine's Hazardous Waste, Septage and Solid Waste Management Act ("WMA"), Me. Rev. Stat. tit. 38, §§ 1301-1319. Id. at 265. In Smith, the Law Court considered whether a municipal septage ordinance was preempted by an MDEP-issued septage spreading permit that the plaintiff received shortly after the ordinance at issue was enacted. See Smith, 820 A.2d at 1208-09. In concluding there was no preemption, the Law Court found that the ordinance did not frustrate the purpose of the WMA since it prohibited only one method of septage disposal while leaving other methods authorized by the WMA intact. Id. at 1208. Indeed, the Law Court explicitly recognized that "[i]f the Town's ordinance prohibited all methods of septage disposal, [the plaintiff] would have a stronger argument

that the purposes of [the WMA] are frustrated." Id. The district court nevertheless let Smith, rather than Sawyer, guide its application of the Law Court's state law preemption analysis. See Portland Pipe Line Corp., 288 F. Supp. 3d at 458 ("As in Smith, this statute contemplates local zoning prohibitions and neither the statute nor [M]DEP review process involves the kind of local land use and impact considerations typically left to localities.").

We need not necessarily opine on the soundness of the district court's reasoning right now because the assertedly preemptive state statute at issue in Smith and Sawyer was the WMA, not the CCA, and thus those cases are not on all fours with the matter currently before us. In addition to serving a purpose distinct from that set forth in the CCA, the WMA includes an express ceiling on local regulation that would interfere with an activity authorized under the statute. See Me. Rev. Stat. tit. 38, § 1310-U (prohibiting municipalities "from enacting stricter standards than those [in the WMA] governing the hydrogeological criteria for siting or designing solid waste disposal facilities" and giving municipalities a limited role in the state licensing process). The CCA is not similarly expressive in outlining the contours of permissible municipal action. See Me. Rev. Stat. tit. 38, § 556 (providing that "ordinances and bylaws in furtherance of the intent of this subchapter . . . are valid unless in direct

- 16 -

conflict with this subchapter or any rule or order of the [MDEP]"). Thus, the Law Court's preemption analysis in Smith and Sawyer is not controlling here, where we must consider the scope of the CCA's regulatory regime to determine whether and to what extent it leaves room for municipal conduct. We are not aware of any decision of the Law Court that resolves whether the CCA preempts (either expressly or by implication) the Ordinance at issue here. Because there are no clear controlling precedents, the state law preemption questions (as set forth below) require certification.

The uniquely local policy interests at stake here also support certification. This is "not a case in which the 'policy arguments line up solely behind one solution.'" In re Engage, 544 F.3d at 57 (quoting Boston Gas Co. v. Century Indem., 529 F.3d 8, 14 (1st Cir. 2008)). This case will impact the day-to-day licensure procedures of a state agency, the future of a local business that has been operating in the area for the better part of seventy-five years, and the City's authority to protect against perceived environmental threats to its coastline. The Law Court is better suited for the challenge of balancing these interests to the extent allowed by applicable state law preemption doctrine.

- 17 -

## III. Certification

For the reasons set forth herein, we certify the following three questions to the Maine Law Court:

(1) Is PPLC's license an "order," as that term is used in Me. Rev. Stat. tit. 38, § 556?

(2) If PPLC's license is an order, is the City of South Portland's Clear Skies Ordinance preempted by Me. Rev. Stat. tit. 38, § 556 of Maine's Coastal Conveyance Act?

(3) Independent of Me. Rev. Stat. tit. 38, § 556, is there any basis for finding that Maine's Coastal Conveyance Act impliedly preempts the City of South Portland's Clear Skies Ordinance?

We would welcome further guidance from the Law Court on any other relevant aspect of Maine law that it believes would aid in the proper resolution of the issues before us.

The Clerk of this Court is directed to forward to the Maine Supreme Judicial Court, under the official seal of this Court, a copy of the certified questions, along with the merits briefs and appendices filed by the parties and the State of Maine as amici, as well as the supplemental briefs filed by the parties and the State of Maine pursuant to this Court's order dated September 23, 2019.