# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

Nos. 02-3854, 02-3897

WISCONSIN BELL, INC., d/b/a Ameritech Wisconsin,

*Plaintiff-Appellee*,

v.

AVE M. BIE, *et al.*, Commissioners of the Public Service
Commission of Wisconsin, in their official capacities,

*Defendants-Appellants*,

and

WORLDCOM, INC.,

*Intervening Defendant-Appellant.*

_____

Appeals from the United States District Court
for the Western District of Wisconsin.
No. 01-C-0690-C—**Barbara B. Crabb**, *Chief Judge.*

_____

ARGUED APRIL 14, 2003—DECIDED AUGUST 12, 2003

_____

Before CUDAHY, POSNER, and EASTERBROOK, *Circuit Judges.*

POSNER, *Circuit Judge.* Local telephone companies such as
Wisconsin Bell have a degree of monopoly power because
of the cost to a competitor of duplicating the grid of tele-
phone wires and switching equipment that constitutes a

local telephone network. The competitor will find it difficult to compete unless it is interconnected with the local network. The Telecommunications Act of 1996 provides a machinery for encouraging interconnection. The competitor can require the local phone company to negotiate, in good faith, an agreement authorizing interconnection on mutually agreeable terms. If negotiations fail, the competitor can seek arbitration by the state regulatory commission, and the commission's arbitral decision can be challenged in federal district court on the ground that the decision fails to comply with 47 U.S.C. §§ 251 or 252, sections that establish pricing and other standards for interconnection. See *Verizon Communications, Inc. v. FCC*, 535 U.S. 467, 492-97 (2002). But the commission's decision cannot be challenged in state court. 47 U.S.C. §§ 252(e)(4), (6).

The question presented by this appeal is whether a state may create an alternative method by which a competitor can obtain interconnection rights. Wisconsin's public utility commission simply ordered Wisconsin Bell to file tariffs setting forth the price and other terms on which competitors such as WorldCom shall be entitled to interconnect with Wisconsin Bell's local telephone network, rather than arbitrating a disagreement between WorldCom and its competitors concerning the terms on which those competitors could interconnect with Wisconsin Bell's local network. Wisconsin Bell challenged the order in federal district court. The judge held that the order is barred by the federal act, and these appeals (by the commission itself, and by WorldCom) followed.

Whether as the district judge ruled the state's tariff-filing order is preempted by the provisions of the federal act creating the contractual route to interconnection depends on whether the state requirement interferes with the federal procedure. The Federal Telecommunications Act is explicit

that a state commission's regulations concerning interconnection are not preempted "if such regulations are not inconsistent with the provisions of [the Federal Telecommunications Act]." 47 U.S.C. § 261(b); *Verizon North, Inc. v. Strand*, 309 F.3d 935, 937-44 (6th Cir. 2002). But if they are inconsistent, they are preempted. A conflict between state and federal law, even if it is not over goals but merely over methods of achieving a common goal, is a clear case for invoking the federal Constitution's supremacy clause to resolve the conflict in favor of federal law, see, e.g., *Gade v. National Solid Wastes Management Ass'n*, 505 U.S. 88, 103-04 and n. 2 (1992)—and so WorldCom acknowledges in its reply brief.

There is an initial question, however, whether the state's tariff order has any practical significance. Wisconsin disclaims authority to fix the rates in the tariffs that it has ordered Wisconsin Bell to file. If taken literally, the disclaimer implies that if Wisconsin Bell wants to prevent WorldCom or other would-be competitors from bypassing the contractual route, and thus to thwart utterly the state commission's alternative procedure, it has only to specify a ridiculously high price in the tariffs that it files. But against this the Wisconsin commission, while disclaiming authority to fix the rates in Wisconsin Bell's interconnection tariffs, asserts a right to insist that the rates be "reasonable." "[T]he commission may not, and is not, specifying the tariff rates, terms, and conditions . . . . However, compliance with this order for tariffing does require good faith on the part of Ameritech; it cannot post a price, or impose terms and conditions, so totally unreasonable as to amount to a de facto avoidance of compliance. An unreasonable price, term, or condition is one that is patently obvious to any reasonably well-informed buyer as intended to discourage or prevent the purchase of the service. Having said that, however, the Commission recognizes that, in any challenge

to a price, term or condition, the proponent would have a heavy burden to prove Ameritech's noncompliance with this order." *Final Decision*, Investigation into Ameritech Wisconsin Operational Support Systems, Docket No. 6720-TI-160, at 20, available at http://psc.wi.gov/pdffiles/ord_notc/3823.pdf (Public Service Commission of Wisconsin Sept. 25, 2001).

In the usual type of common carrier or public utility regulation, the reasonableness of a rate is determined by reference to the cost of the tariffed service; the carrier or utility is constrained to fix a rate no higher than necessary to cover the cost of the service. The passage we just quoted from the Commission's decision suggests that only an outlandish discrepancy between the tariffed rate and the cost of service will trigger a finding of unreasonableness. This implies that Wisconsin Bell's pricing freedom is constrained only to the extent that it may not fix a rate that exceeds the upper end of the range of prices likely to emerge from a negotiation with a would-be competitor in accordance with the procedures set forth in the federal act. The tariffing requirement would still be pretty empty because the would-be competitor would expect to be able to do better in a negotiation subject to arbitration than merely to bow to the telephone company's opening bid.

We were led by these ruminations to direct the parties to file supplemental briefs explaining just what is at stake in this case. We learn from these briefs that while indeed disclaiming power to fix Wisconsin Bell's rates, the Wisconsin commission has ruled that the rates in the tariffs that it has required Wisconsin Bell to file must be based on the cost of the tariffed services as determined in accordance with cost-accounting procedures prescribed by the commission; specifically, the rates must be based on "the sum

of the Total Element Long Run Incremental Cost (TELRIC) and a reasonable allocation of forward-looking joint and common costs." *Final Decision*, Investigation into Ameritech Wisconsin's Unbundled Network Elements, Docket No. 6720-TI-161, at 22-23, available at http://psc.wi.gov/pdffiles/ord_notc/4534.PDF (Public Service Commission of Wisconsin Mar. 22, 2002). Rates so determined will prevent Wisconsin Bell from setting a "take it or leave it" rate that might deter all prospective entrants from taking the tariff route. "As explained in the *Final Decision*, this order does not establish [the tariff rates] themselves, but determines the details of a methodology that can be used to determine cost-based [tariffs] as required. For example, the Commission made the determinations in its *Final Decision* for the appropriate cost of capital, depreciation rates, level of spare capacity (fill), contract prices and joint and common mark-up to comply with forward-looking TELRIC pricing standards to name a few such details." *UNE Compliance Order*, Investigation into Ameritech Wisconsin's Unbundled Network Elements, Docket No. 6720-TI-161, at 61, available at http://psc.wi.gov/pdffiles/ord_notc/ 6145.PDF (Public Service Commission of Wisconsin July 9, 2003). These decisions make clear that it is the commission, not Wisconsin Bell, that is making the tariff in a realistic sense. The statement by our dissenting colleague that the decisions from which we have quoted do not concern the tariffs that the Commission has ordered Wisconsin Bell to file is incorrect. The decisions expressly direct Wisconsin Bell to file conforming tariffs on unbundled network elements (UNE), March 22 order, *supra*, at 2, which are a component of operational support systems (OSS), the general term for the provision of access by a local phone company to a new entrant. Sept. 25 order, *supra*, at 1 n. 1.

The district court was right to hold that the state's tariffing requirement is preempted. See *Verizon North, Inc. v.*

*Strand, supra,* 309 F.3d at 941; *MCI Telecommunications Corp. v. GTE Northwest, Inc.,* 41 F. Supp. 2d 1157, 1178 (D. Ore. 1999); but cf. *Michigan Bell Tel. Co. v. MCIMetro Access Transmission Services, Inc.,* 323 F.3d 348, 358-60 (6th Cir. 2003). The requirement *has* to interfere with the procedures established by the federal act. It places a thumb on the negotiating scales by requiring one of the parties to the negotiation, the local phone company, but not the other, the would-be entrant, to state its reservation price, so that bargaining begins from there. And it allows the other party to challenge the reservation price, and try to get it lowered, by challenging the tariff before the state regulatory commission, with further appeal possible to a state court—even though Congress, in setting up the negotiation procedure, explicitly excluded the state courts from getting involved in it. At the very least, the tariff requirement complicates the contractual route by authorizing a parallel proceeding.

It is true that the arbitral procedure prescribed by the federal act is not completely freewheeling. The state commission is required, in the event the parties cannot come to an agreement, to establish terms of interconnection based on the same TELRIC pricing standard that the commission would apply to a tariff challenge. *Verizon Communications, Inc. v. FCC, supra,* 535 U.S. at 493-97. But it does not follow that the tariff route and the negotiation route are the same or have the same effects. An appeal from the commission's resolution of an entrant's challenge to a tariff would go to a state court, rather than a federal court, a difference that cannot be assumed to be inconsequential. And given the vagaries of the regulatory process, which requires such stabs in the dark as making "reasonable projections" of the use that a prospective entrant will make of access to the local network if interconnection is ordered, *id.* at 496 n. 16, and the fact, as the Court noted in that case, that in

setting rates the state commissions are subject to an "important limitation previously unknown to utility regulation," *id.* at 493, the results of a negotiation between the local phone company and a prospective entrant are not preordained—if it were, the federal law would not have made recourse to the commission a last resort if negotiations fail. The tariff procedure shortcircuits negotiations, making hash of the statutory requirement that forbids requests for arbitration until 135 days after the local phone company is asked to negotiate an interconnection agreement. 47 U.S.C. § 253(b)(1).

The commission and WorldCom argue that by providing an alternative means of obtaining interconnection, the state's tariff requirement promotes the procompetitive policy of the federal act. But to identify the policy underlying a statute and then run with it is a dangerous method of interpretation; it is likely to run roughshod over the compromise between interest groups that enabled the statute to be passed in the first place. *Rodriguez v. United States*, 480 U.S. 522, 525-26 (1987) (per curiam); *Hrubec v. National Railroad Passenger Corp.*, 49 F.3d 1269, 1270 (7th Cir. 1995); *Bethlehem Steel Corp. v. EPA*, 723 F.2d 1303, 1309 (7th Cir. 1983); Philip P. Frickey, "From the Big Sleep to the Big Heat: The Revival of Theory in Statutory Interpretation," 77 *Minn. L. Rev.* 241, 251 (1992). The negotiation procedure established by the federal act provides the local phone company with a degree of protection that it would lack if the state commission could, by requiring the company to file a tariff that the commission might invalidate as unreasonable, enable would-be entrants to bypass the federally ordained procedure.

AFFIRMED.

CUDAHY, *Circuit Judge*, dissenting.  The starting point for the present analysis must be the strong presumption against preemption of state law, especially in the area of local telephone service where, until the passage of the Telecommunications Act of 1996 (the Act or FTA), Pub. L. No. 104-104, 110 Stat. 56, the states had historically exercised an *exclusive* jurisdiction. *See Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485-86 (1996); *Louisiana Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355 (1986). No doubt the FTA prescribes a specific, but I believe non-exclusive, process for determination of prices to be charged by incumbent carriers to aspiring competitors. But the Act makes clear that state regulatory processes are not to be voided unless they can be shown to conflict with federal purposes. In fact, as the majority notes, the FTA clearly addresses the issue of preemption as follows:

> Nothing in this part shall be construed to prohibit any State commission from enforcing regulations prescribed prior to February 8, 1996, or from prescribing regulations after February 8, 1996, in fulfilling the requirements of this part, if such regulations are not inconsistent with the provisions of this part.

47 U.S.C. § 261(b). Plus, the Act has a more general savings clause. "This Act and the amendments made by this Act shall not be construed to modify, impair, or supersede Federal, State, or local law unless expressly so provided in such Act or amendments." FTA § 601(c)(1). Not only did Congress limit the general preemptive power of the Act, but it further expressly delegated an important and integral role to the state commissions in establishing prices under the act as follows:

> (1) Interconnection and network element charges. Determinations *by a State commission* of the just and reasonable rate for the interconnection of facilities and

equipment for purposes of subsection (c)(2) of section 251 of this title, and the just and reasonable rate for network elements for purposes of subsection (c)(3) of such section—

>   (A) shall be—

>>      (i) based on the cost (determined without reference to a rate-of-return or other rate-based proceeding) of providing the interconnection or network element (whichever is applicable), and

>>      (ii) nondiscriminatory, and

>   (B) may include a reasonable profit.

47 U.S.C. § 252(d)(1) (emphasis added).[1]

---

[1] The F.C.C. has implemented these standards with regulations outlining the TELRIC costing methodology. For example, 47 C.F.R. § 51.503(b) provides in pertinent part:

>   (b) An incumbent LEC's rates for each element it offers shall comply with the rate structure rules set forth in §§ 51.507 and 51.509, and shall be established, *at the election of the state commission*—

>>      (1) Pursuant to the forward-looking economic cost-based pricing methodology set forth in §§ 51.505 and 51.511 . . . .

(emphasis added) and 47 C.F.R. § 51.505(a) provides in pertinent part:

>   (a) In general. The forward-looking economic cost of an element equals the sum of:

>>      (1) The total element long-run incremental cost of the element, as described in paragraph (b); and

>>      (2) A reasonable allocation of forward-looking common costs, as described in paragraph (c).

The only question we must answer is whether a Wisconsin order requiring an incumbent carrier to offer by tariff the same network elements available by negotiated and arbitrated interconnection agreements is "inconsistent" with the "provisions" of the Act. The majority says yes. I disagree.

There are several points to be made in response to the majority. The majority, in essence, reduces the conflict to one of an alternative procedure when it bemoans that, "at the very least[,]" the tariff authorizes a "parallel procedure," and that tariffing is "making hash" of the 135 day waiting period before the state can be summoned to arbitrate in a manner similar to its function in the tariffing process. In this discussion, the majority appears to echo the errors of the Sixth Circuit, which has similarly justified preemption based on interference with § 252's procedure. The Sixth Circuit found preemption by misinterpreting the Supreme Court decision in *Gade v. National Solid Wastes Management Ass'n*, 505 U.S. 88 (1992), involving the preemptive effect of the Federal Occupational Safety and Health Act (OSHA) on parallel state regulation. *Verizon North, Inc. v. Strand*, 309 F.3d 935, 940 (6th Cir. 2002); *cf. Michigan Bell Tel. Co. v. MCIMetro Access Transmission Servs., Inc.*, 323 F.3d 348, 360 (6th Cir. 2003) (finding no preemption because tariff did not give entrant an "alternative route around the entire interconnection process"). These Sixth Circuit cases argue that, because the negotiation method was prescribed by § 252, any other method allowing one to foreshorten negotiation/arbitration must be preempted.

This result is reached, however, by seizing upon a quotation from *Gade* and using it out of context. *Gade*, 505 U.S. at 103 ("A state law also is pre-empted if it interferes with the methods by which the federal statute was designed to reach th[at] goal.") (alterations in original), quoting *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987). However,

*Gade* was based on a finding that, with respect to occupational safety and health, Congress had intended to occupy the whole field. The quotation cited by the Sixth Circuit, in context, merely reinforces *Gade*'s conclusion that OSHA preempted the entire field of parallel state regulation. Therefore, of course, any state law that circumvented the procedure outlined in OSHA would be preempted. By contrast, with respect to competition for local telephone service, no one has claimed that Congress intended to occupy the whole regulatory field. As the excerpt that I have quoted from the Act shows, the state commissions occupy a key role in the regulatory scheme. Hence, the whole idea that the *method* of negotiation/arbitration is exclusive and preemptive has no sound legal basis. While *Gade* showed a clear intent to exclude parallel state regulation, the Act here does not exclude, but rather specifically embraces, such parallel regulation. So a finding of preemption here requires much more than merely a parallel procedure. Something about tariffing must interfere with the purpose and structure of the Act. *See, e.g.*, *In re Public Utility Commission of Texas*, 13 F.C.C.R. 3460, 3526 (1997) (finding that state tariffing of telecommunications services for resale not preempted because it did not prohibit entrants from demanding negotiation/arbitration under § 252).

The majority appears to be reaching for an argument that the tariff interferes with more than a method when it laments the economic "thumb on the negotiating scales" it believes that tariffing imposes on Wisconsin Bell. But in context this argument lacks substance—the § 252 mechanism already contemplates a very similar "thumb" inherent in its negotiation/arbitration method of interconnection. What the Public Service Commission of Wisconsin (PSC or commission) has told us is that it would use the federal

TELRIC[2] methodology mandated by the F.C.C. and approved by the Supreme Court, if called upon to evaluate a proposed tariff. *Verizon*, 535 U.S. 467. This is the methodology the PSC must use whenever it is requested to arbitrate interconnection negotiations under the Act, or to approve an arbitrated interconnection agreement under the Act or to approve the eerily tariff-like Statement of Generally Available Terms that Wisconsin Bell could choose to file under § 252(f).[3] So any negotiation of an interconnection agreement is an option backed by the readiness of a state commission to intervene at any time on the request of any party, at which point the commission will set rates, and will use the TELRIC methodology to do so. The state's role as a ratemaker, even under the regime of the Act, is still central. *See Verizon*, 535 U.S. at 476-77, 489, 493 (explaining that the FTA clearly contemplates a central role for state commissions in setting interconnection lease rates under the standards set by the F.C.C., i.e., TELRIC). In fact, the state's function and the appropriateness of TELRIC have been the subjects of two lawsuits pursued to the Supreme Court by incumbent companies. *Id.*; *AT&T Corp. v. Iowa Utilities Bd.*, 525 U.S. 366 (1999).[4]

To ponder the majority opinion is to imagine that the tariff requirement would somehow bludgeon Wisconsin Bell into

---

[2] TELRIC is Total Element Long-Run Incremental Cost, the cost-based methodology for determining the price of network elements necessary to interconnection under the Act. It was prescribed by the F.C.C. under the terms of the Act. *See Verizon Communications, Inc. v. F.C.C.*, 535 U.S. 467 (2002).

[3] *See* 47 U.S.C. § 252(d); 47 C.F.R. §§ 51.501-505.

[4] Historically, state commissions (although not necessarily Wisconsin's) generally favored the former Bell system companies in their struggles with the F.C.C.'s preaching of competition.

revealing negotiating secrets, like its reservation price, that it would otherwise be able to protect, or into otherwise bargaining from an inferior position. The reality is that any entrant that does not feel satisfied with Wisconsin Bell during negotiations can summon the PSC to follow a procedure virtually identical to what is going on unilaterally during the tariffing process at issue. In fact, if anything, the statutory role of the PSC as arbitrator is more intrusive than the tariffing process at issue here. In tariffing, Wisconsin Bell has the opportunity to propose the terms of the tariff, which ordinarily are not disturbed. As arbitrator, however, the PSC dictates the rate, in accordance with TELRIC. In other words, the tariff procedure (a process employed since time immemorial in the regulation of local telecommunications carriers) gives a very similar result through a process just like the negotiation/arbitration method, lacking only the initiating request by an entering competitor to negotiate. And at the end of either process, negotiation/arbitration or tariffing, an aggrieved Wisconsin Bell can challenge the result in federal court. I believe the majority is incorrect when it claims that a tariffing challenge would go to state court. Insofar as the challenge would concern the state's application of the TELRIC standard in evaluating a tariff, it is likely that the federal courts would have jurisdiction over the matter, just as they would over a challenge to an arbitrated interconnection agreement. *See Verizon Maryland, Inc. v. Public Service Comm'n of Maryland*, 535 U.S. 635, 641-44 (2002).

But, says the majority, the method of § 252 represents Congress's careful compromise of interest group positions and any regulation that influences or alters that process risks undermining the "protection" afforded incumbents like Wisconsin Bell. That is an interesting thought, but unsupported by the statute. And even if one does believe the method outlined in § 252 is designed to provide some

measure of protection to incumbents, any postulated loss of supposed protection through the tariffing method is illusory. One need only examine two hypothetical negotiations to see this. In one negotiation there exists a PSC-approved tariff and in the other there is no tariff. In the tariff negotiation, Wisconsin Bell will likely obtain no price higher than its tariff offers since the entrant will either accept the tariff or negotiate with Wisconsin Bell for a price lower than the tariff. In the non-tariff negotiation Wisconsin Bell can, as the majority believes proper, propose any price it chooses. The entrant, however, knowing that it can always look to the state to participate eventually, will not accept a price greater than what it would eventually get from the state—presumably an amount roughly equal to what the tariff price would be (since the same methodology would be used in both instances).[5] Either way, the applica-bility of the ubiquitous TELRIC standard limits incumbents' bargaining power. Wisconsin Bell cannot avoid the fact that its "reservation" price is, in this way, always quasi-public in all interconnection environments.

---

[5] This presumes, of course, that, as the TELRIC methodology promises, the resulting tariff is not merely a one-size-fits-all menu of prices and services, but is, instead, sensitive to the variations in cost from entrant to entrant. *See Verizon*, 535 U.S. at 496 n.16 ("The actual TELRIC rate charged to an entrant leasing the element would be a fraction of the TELRIC figure, based on a 'reasonable projection' of the entrant's use of the element (whether on a flat or per- usage basis) as divided by aggregate total use of the element by the entrant, the incumbent, and any other competitor that leases it."). The majority makes much of the fact that the PSC has asserted that Wisconsin Bell (and everyone else) is bound by the TELRIC costing methodology. But this is merely a restatement of what federal law, implemented by a federal agency, has decreed. *See* note 1, *supra*.

From all appearances, requiring a tariff is not inconsistent with the negotiation of a price or with the ultimate prescription of a price determined by the state commission as arbitrator. This is especially so, given that the tariff does not impede the right of an entrant to demand negotiation. It may be that the majority, the district court and some other courts that have viewed this problem have looked upon the negotiation phase as providing a purely "free market" solution as opposed to a regulatory solution. I think this dichotomy simply does not exist here, where all parties are bound to the TELRIC method of rate determination. In fact, as the Supreme Court has recognized in rejecting the challenges of incumbent companies, TELRIC controls throughout. *See* Daniel F. Spulber & Christopher S. Yoo, *Access to Networks: Economic and Constitutional Connections*, 88 Cornell L. Rev. 885, 969 (2003) ("TELRIC thus governs all of the important pricing aspects of the access regime created by the 1996 Act.").

Finally, the majority includes a discussion of the hypothetical process by which a tariff is proposed and then approved by the PSC. But what is involved here is simply a facial challenge to the PSC's ability to require tariffing under any circumstances. No price term or any other term for the tariff has yet been proposed. Speculation about possible terms is, therefore, beside the point in this facial challenge, and the only issue is whether there is any set of facts under which the PSC can require tariffing.

In fact, the majority's hypothetical discussion goes seriously astray by fortifying its arguments with quotations from PSC decisions and orders that do not concern the Operational Support Systems (OSS) tariffs at issue here, but are, instead, orders and decisions with respect to the establishment of TELRIC standards for the *negotiation and*

*arbitration mechanism* of the Act.[6] *See UNE Compliance Order*, Investigation into Ameritech Wisconsin's Unbundled Network Elements, Docket No. 6720-TI-161, available at http://psc.wi.gov/pdffiles/ ord_notc/6145.PDF (Public Service Commission of Wisconsin July 9, 2003); *Final Decision*, Investigation into Ameritech Wisconsin's Unbundled Network Elements, Docket No. 6720-TI-161, available at http://psc.wi.gov/pdffiles/ord_notc/4534.PDF (Public Service Commission Wisconsin Mar. 22, 2002) ("*UNE Final Decision*"). I am tempted to dismiss these decisions as simply inappropriate and irrelevant with respect to the present case's evaluation of OSS tariffs, especially as used by the majority. Or I might point out that the majority's claim that "it is the commission, not Wisconsin Bell, that is making the tariff in a realistic sense" does not logically follow from the part of the decision quoted because that refers to PSC actions on standards for arbitration and has nothing to say about the OSS tariffs.[7] Or, in the

---

[6] The PSC was the first to bring the two UNE Orders into the present case when, in its second supplemental brief, it used a quotation from the UNE Final Decision to support its claim that TELRIC is a methodological means, not a ratesetting end. However, the majority overreaches when it uses these documents to demonstrate that the PSC exercises control over the final result of the tariffing process.

[7] In fact, when one continues to read onward, but a few pages later, the PSC does finally have something to say about tariffs (but not the OSS tariffs). These tariffs are required under the *UNE Final Decision* as a temporary offering made available to entrants who have requested interconnection and are to be used only during the pendency of the negotiation/arbitration. *UNE Final Decision* at 187 ("[Wisconsin Bell] is required to file UNE tariffs in addition to the tariffs already required under the OSS order. . . .

(continued...)

alternative, I might note a certain irony in how the "realistic sense" in which the PSC is allegedly "making the tariff" is actually the PSC acting as arbitrator to the interconnection process that the majority ostensibly seeks to protect. But instead, I will only comment that the UNE decisions' TELRIC discussions cited by the majority reinforce my basic premise, which is that the tariffing is not markedly different from the negotiating and arbitrating procedure. The differences are purely matters of form, not involving substance, and are not inconsistent with the provisions of the Act.

When one strips away the tangential distractions, the majority has ruled that Congress intended there to be only one method to achieve interconnection and establish its terms. The Act does not support this conclusion.

---

[7] (...continued)
Those tariffs [the OSS tariffs] will meet the tariffing requirement in this order, but are not time limited as are the other tariffs ordered herein."). The PSC notes, tellingly,

> To implement this tariffing decision, the Commission required [Wisconsin Bell] to file proposed tariffs in its compliance filing. However, in Wisconsin, when tariffs are placed on file, *Commission approval is not required.* Additionally, *[Wisconsin Bell] is allowed to revise tariffs without Commission approval.* Accordingly, when issues arise about the terms and conditions of offerings, it is expected that arbitration panels will determine whether terms of offerings are non-discriminatory and comply with federal and state requirements. The tariffs filed as a result of this proceeding do not limit an arbitration panel's ability to establish such compliant terms and conditions.

*UNE Compliance Order*, at 65 (emphasis added). To the extent that this Order is relevant to the present case, I do not believe it offers support to the majority opinion.

I therefore respectfully dissent.

A true Copy:
     Teste:

                           _____

*Clerk of the United States Court of
Appeals for the Seventh Circuit*